(36 Misc. Rep. 139.)

## PEOPLE v. MOST.

(Court of Special Sessions of First Division of City of New York. October, 1901.)

PUBLISHING ANARCHISTIC DOCTRINES.

Defendant publish'd and distributed a German newspaper, reproducing an article entitled "Murder vs. Murder," originally written 50 years ago, teaching the doctrine of anarchy, and declaring that all rulers were enemies of mankind, and should be destroyed by poison and dynamite, blood and iron. It was not shown that the publication of the article was followed by any overt act of physical injury to any one. *Held*, that the defendant was guilty of a misdemeanor, within Pen. Code, § 675, providing for a punishment as for a misdemeanor of any one who shall commit any act endangering the public peace, or openly outraging public decency, for which no other punishment was provided in the Code.

John Most was indicted for publication of an anarchical article. Judgment of conviction.

Moses Herrman, Asst. Dist. Atty., for the People.
Hillquit & Hillquit, for defendant.

TINSDALE, J. When the men framed the Penal Code of the state of New York, they undertook to specify all the crimes known to the law, to state their character,—whether felonies or misdemeanors,—and provide a penalty in each class of crimes by naming a minimum and maximum penalty in most cases. The attempt to thus codify the criminal law was declared by many able jurists an impossible undertaking. It was argued that the system of laws called the "common law" was the accumulated wisdom of ages; that it was flexible, and able to adapt itself to every new manifestation of crime that might appear, keeping within the spirit of established principles of justice, but always able to cope with any form of crime that might develop. That there was great force to this objection was felt by the codifiers and by all jurists. They knew the infirmity of language and the fallibility of the human intellect in undertaking to define in precise terms every crime. On the other hand, the common law of crimes was in many respects overgrown with a multitude of precedents and decisions, and its roots ran back through so many centuries of time that it was only to be learned by wading through a mass of books so great that there was much difficulty in some cases in determining what was the common law. After framing 674 sections of the Penal Code, specifying crimes and punishments as completely and fully as the codifiers were able to state them, they framed the 675th section, which contains these words:

'A person who wilfully and wrongfully commits any act which seriously injures the person or property of another, or which seriously disturbs or endangers the public peace or health, or which openly outrages public decency, for which no other punishment is expressly prescribed by this Code, is guilty of a misdemeanor."

The plain and obvious intent of this was to leave in the Code a little of the flexibility of the common law to meet cases which they had failed to specify in the preceding sections. That the words of this section are general is just what might be expected from the nature of the case. The purpose of the section is to try offenders for something not "expressly prescribed by this Code." If the offense was one expressly prescribed by the Code, then clearly the offender must be tried under the section prescribing it. It is only offenses not prescribed in the Code that can be tried under this section. This section is the legislative mandate and warrant for courts to look outside of all the other sections of the Code to discover offenses not specified in the Code; otherwise the section is meaningless. It is fair to presume that the legislature thought that crimes would crop up that would "seriously injure the person or property of another," or "seriously disturb or endanger the public peace," or "openly outrage public decency," that were not mentioned in the body of the Code, and so this commission was issued to the courts to explore such new fields of crime as they may appear from time to time. We are therefore brought face to face with the question whether

the acts charged in the information in this case are criminal acts within the spirit and intent of this section. That the section is general in its words, and not specific, was a necessity of the purpose of this enactment. That the crimes that come within the range of this law are comparatively new and novel to the law is to be expected. If it were otherwise, they would have been specified in the body of the Code. The acts that might be committed to produce the results condemned by the section were not common acts then generally known to criminal laws. If the conditions of "injuries to persons or property," or "serious disturbance and danger to the public peace," or "openly outrage public decency" are found to exist, it then becomes the duty of courts to find the author of those conditions, and punish him as the law directs. We hold that the teachings of the doctrine of anarchy "seriously disturb or endanger the public peace," and also "openly outrage public decency." To give this construction to the law in no way abridges the liberty of conscience in matters of religion, nor the freedom of speech on all questions of government or of social life, nor does it in any way trespass upon the proper freedom of the press. The point and pith of the offense of anarchists is that they teach the doctrine that the pistol, the dagger, and dynamite may be used to destroy rulers. The teaching of such horrid methods of reaching an end is the offense. It is poor satisfaction, when one of their dupes has consummated the results of their teaching, to catch him, and visit upon him the consequences of his acts. The evil is untouched if we stop there. In this class of cases the courts and the public have too long overlooked the fact that crimes and offenses are committed by written or spoken words. We have been punishing offenders in other lines for words spoken or written without waiting for an overt act of injury to persons or property. The press is restrained by the law of libel from the too free use of words. Individuals can be punished for words spoken or written, even though no overt act of physical injury follow. It is the power of words that is the potent force to commit crimes and offenses in certain cases. No more striking illustration of the criminal power of words could be given, if we are to believe the murderer of our late president, than that event presents. The assassin declares that he was instigated and stimulated to consummate his foul deed by the teachings of Emma Goldman. He is now awaiting execution for the crime, while she is still at large in fancied security. A person may advocate any change of our government by lawful and peaceful means, or may criticise the conduct of its affairs, and get as many people to agree with him as he can, so long as he does not advocate the commission of crime as the means through which he is to attain his end. If he advocates stealthy crime as the means of reaching his end, he, by that act, commits a crime for which he can be punished. The distinction we have tried to point out has been too long overlooked. If our conclusions are sound, it is the teachers of the doctrine who can and ought to be punished. It is not necessary to trace and establish the connection between the teaching of anarchy and a particular crime of an overt nature. It is a strange spectacle

in this age for a great nation to stand mute and paralyzed in the presence of teachers of crime that are advocated only for the purpose of destroying such nation, and it have no power to defend against such internal enemies. We do not believe the arm of the law is too short to reach those offenders against the life of the nation, or too paralyzed to deal with them. The liberty of conscience, the freedom of speech, the freedom of the press, do not need such concessions to save to the fullest extent unimpaired those sacred rights of a free people.

In the case at bar every fact stated in the information was conceded on the trial. The article published in the newspaper called the Freiheit, annexed to the information, was printed in the German language, but the translation of it was admitted by the defendant to be correct. It was also admitted that the paper was published and circulated in the city and county of New York, and that on the 7th day of September, 1901, the date of the issue containing the article in question, the defendant was the publisher of said newspaper; that the article was published and circulated before the assault on the late president of the United States. It was contended that the defendant was not the author of said article; that the same was written and published by one Carl Heinzen about 50 years ago, and was reprinted by the defendant in the Freiheit on March 14, 1885; that the defendant, John Most, as soon as he learned of the assault upon our late president, made all possible efforts to withdraw the newspaper containing the article in question from circulation; that, with the exception of those which had been sent through the mail and delivered to the International News Company, no more copies had been sold, so far as known to the defendant. It was also admitted that the copy of said newspaper attached to the information was purchased by the complainant from the International News Company. The article was the leading one on the editorial page of the paper, and it is headed "Murder vs. Murder" in display type. The article begins:

"As Heinzen said, nearly fifty years ago (this is true even to-day), there are various technical expressions for the important manipulation by which one human being destroys the life of another. These expressions are: 'To kill, to destroy, to murder, to shoot, to slay, to poison, to put out of the world, deport to Cayenne, get out of the way, to behead, to strangle, to cut down, to be killed by the sword, to execute by shooting, to imprison for life, to execute, etc.' The means, the pretext, and the reasons are various, but the purpose is always the same,—the destruction of a life that is hostile or a hindrance. It would be a senseless weakness to disguise by sentimental lamentations the frightful fact that the best means of historical development has been murder, and in fact murder in the most colossal shape, and this is still true. * * * Let murder be our study, murder in every form. In this one word lies more humanity than in all our theories. * * * The despots are outlawed. They are in human society what the tiger is among animals. To spare them is a crime. As despots permit themselves everything,—betrayal, poison, murder, etc.,—in the same way all this is to be employed against them. Yes, crime directed against them is not only right, but it is the duty of every one who has an opportunity to commit it, and it would be a glory to him if it was successful. Only towards mankind is there a moral of consideration; the moral towards beasts is destruction.

\*   \*   \*   Murder as a necessary defense is not only permissible, but it is sometimes a duty towards society when it is directed against a professional murder.   \*   \*   \*   The way of humanity leads over the summit of barbarism. This the just law of necessity dictated by reaction. We cannot get around it, as we do not wish to renounce the future. If we wish to design, we must also wish the means; if we wish the life of the peoples, we must wish for the death of their enemies; if we wish for humanity, we must wish for murder.   \*   \*   \*   It would be quite a new war policy if, in the circus, the panther permitted the buffalo to prescribe to him that he should defend himself with horns against horns, and that he should not immediately spring upon his back from behind. The buffalo militarism request that the revolutionists disarm to the skin, should march openly against him, after declaration of war, in optima, forma militari, with cannons and ammunition wagons, with cavalry and infantry, after the people had been disarmed. We do not suffer from such weakness. We say murder for murderers; save humanity through blood and iron, poison and dynamite."

The above are a few extracts from the translation of the article in question. It is impossible to read the whole article without deducing from it the doctrine that all rulers are enemies of mankind, and are to be hunted and destroyed through "blood and iron, poison and dynamite." It is no answer to the evil and criminal nature of this article to claim that it was written for the purpose of destroying crowned heads. It inculcates and enforces the idea that murder is the proper remedy to be applied against rulers. The fact that it was published 50 years ago, and again republished about 15 years ago, only emphasizes and gives added point to the criminality of republishing it at any time. It shows a deliberate intent to inculcate and promulgate the doctrine of the article. This we hold to be a criminal act. It is not necessary to trace any connection in this article with the assassination of the late president. The offense here, in the eye of the law, is precisely the same as if that event had never occurred. The murder of the president only serves to illustrate and illuminate the enormity of the crime of the defendant in teaching his diabolical doctrines.

Such articles and doctrines have no proper place in this free country. They stimulate the worst possible political ideas and passions, and, carried to their logical conclusion, would destroy the government. It was said by a distinguished English judge, in the celebrated Somerset slave case, that "no slave can breathe the free air of England." It would be well if the laws of this country were such that it could be said truthfully that no anarchist can breathe the free air of America.

HOLBROOK and WYATT, JJ., concur.