## 1043. ROBERTS *v.* THE STATE.

1. In construing statutes, the cardinal canon of construction is the legislative intent. When the intention is ascertained, it governs, and the mere letter of a statute must yield to the spirit.

2. The intention of the legislature in enacting the prohibition statute (Acts 1907, p. 81) was to prevent the evils of intemperance caused by the use of intoxicating liquors as a beverage. The law should be interpreted so as to accomplish this beneficent purpose. There should be a reasonable construction, equally removed on the one hand from that extreme strictness which would make it unpopular or ridiculous and difficult of enforcement, and, on the other, from that latitude which would render it ineffective.

3. The true scope and meaning of the prohibition statute is to stop the use, as beverages, of all intoxicating liquors, by whatever name called, or under whatever guise made. As the means to this end, it is made unlawful to manufacture, sell, or barter, directly or indirectly, "any alcoholic, spirituous, malt or intoxicating liquors or, intoxicating bitters or other drinks which, if drunk to excess, will produce intoxication;" and to more effectually accomplish the end in view, and to prevent evasions of the law, it is made unlawful "to give away to induce trade at any place of business, or keep or furnish at any other public places, . . or keep on hand at their place of business," any liquors of this description.

4. The phrase "place of business," as used in the act, construed by the context and giving to the words their ordinary, usual, and proper significance, means a public place of business, in contradistinction to a place of private business,—a place where the public, having business with the owner, are impliedly or expressly invited for its transaction. The word "business" is used in the sense of trade, commerce, or traffic, and not as synonymous with occupation, vocation, or employment.

5. A room used solely for the purpose of storage, which is kept locked, to which the public are not invited, and from which the public are excluded, and in which no business is transacted, is not a "place of business," in the sense of the prohibition statute. It is not unlawful to keep alcoholic liquors stored in such a room, where it appears that the liquor is never drunk therein, or taken therefrom to be drunk elsewhere, but that it is used by the owner only for the purpose of making a non-alcoholic syrup or drink in a private laboratory, from which the public are also excluded.

6. The words "alcoholic, spirituous and malt liquors," in the prohibition statute, mean intoxicating liquors which can be used as a beverage, and which, when drunk to excess, will produce intoxication. If the liquid manufactured or sold, or kept on hand at a public place, or at a place

of business as defined in the fourth headnote, can not be used as an intoxicating drink, because of other ingredients, or is not intoxicating because it does not contain a sufficient amount of alcohol to cause intoxication .when drunk to excess, it is not within the prohibition of the statute, although it does contain as one of its ingredients an appreciable quantity of alcohol or spirituous liquor.

7. It was error to instruct the jury that it would be a violation of the statute to keep on hand "any spirituous or alcoholic liquors at his place of business;" and that "it could make no difference whether the liquors· were in proper form to be used as a beverage or not; the statute condemns the keeping on hand of liquors which fit this description, and it refers to any liquid which has such ari appreciable quantity of alcohol in it as to come under the term 'alcoholic liquors.' "

(a) A liquid not in "proper form to be used as a beverage," and having in it only an appreciable quantity of alcohol, is not within the fair meaning of the language of the statute, which aims at the use of intoxicating liquors as a beverage.

(b) The mere presence of alcohol does not bring the liquid or liquor within the prohibition. There must be a sufficient quantity to produce intoxication when drunk to excess.

(c) Medicinal, toilet, and culinary preparations, recognized as such by standard authority (such as the United States Dispensatory), not intended to, be used as intoxicating beverages, and not reasonably capable of being so used, such as paregoric, essence of lemon, essence of ginger, bay-rum, cologne, wood alcohol, and the like, are not embraced within the terms "alcoholic" and "spirituous liquors," although such articles are liquid, contain alcohol, and may produce intoxication.

(d) "Intoxicating liquors," or mixtures thereof, reasonably construed, mean liquors which will intoxicate, and which are commonly used as beverages of such purpose, and also such mixtures of the same as, retaining their alcoholic qualities, may be used as a beverage and become a substitute for the ordinary intoxicating drinks.

8. Can it be legal to manufacture and sell medicines, culinary and toilet articles, non-alcoholic syrups, and what are generally known as "soft drinks," and illegal to keep on hand at the place of manufacture alcoholic or spirituous liquor which constitutes a necessary ingredient of such articles, and which is intended to be used only in their manufacture? *Quære.* ·

9. Prohibition is not a crusade against medicine, culinary or toilet articles, or those beverages which can not intoxicate. These things are necessary to life, health, and comfort. Prohibition is a crusade against intoxicating liquors as a beverage, and the resultant evils of intemperance.

Certiorari, from Fulton superior court—Judge Ellis, February 22, 1908.

Argued March 31,—Decided April 9, 1908.

*Rosser & Brandon, A. M. Brand,* for plaintiff in error.

*C. D. Hill, solicitor-general, Lowry Arnold, solicitor, John A. Hynds,* contra.

HILL, C. J.   E. Mayson Roberts was convicted in the criminal court of Atlanta, on an accusation charging him with the violation of what is known as the prohibition statute, in that he "did keep on hand at his place of business alcoholic and spirituous liquors, contrary to law." His petition for a writ of certiorari was refused by the superior court of Fulton county, and he brings the case to this court for review. The material facts, which are practically undisputed, make the following case: Roberts was a manufacturer of a non-alcoholic syrup used for making what is known as a "soft drink." This beverage was not made on the defendant's premises, but the non-alcoholic syrup was sold to dealers who used it in making beverages at their various places of business throughout the country. The syrup was made in the defendant's laboratory, he being a licensed druggist, and this laboratory was located in the rear of his dwelling-house, on Courtland street in the city of Atlanta. The front room of his residence was used by him as an office; and whenever persons visited him on business, they were received in this office, and nowhere else. Most of his business was conducted by correspondence, and the public was excluded from every portion of the premises except this office. In the rear of his residence, separated from it by a fence and near to the laboratory, he had a storeroom, in which he kept a liquid or liquor, which he is charged with keeping on hand at his "place of business" in violation of the statute. This storeroom was kept locked, and no one was admitted therein except one particular clerk, who kept the key, and the defendant. When it became necessary to use the liquid or liquor in question in the manufacture of the syrup, this clerk carried to the laboratory, from the storeroom, the quantity that was necessary for the purpose; and when it reached the laboratory it was immediately mixed with other ingredients composing the syrup. This storeroom and the laboratory were not connected with the residence, but were reached by an alley leading from Courtland street, being under different roofs from that of the residence. There was only one door leading from the storeroom, and no one was permitted in the back yard except employees; and no one at any time was permitted to go into the storeroom, except the one employee of the defendant, for the purpose above mentioned. The formula of the non-alcoholic syrup manufactured by the defendant was a secret, and for

14

this reason he excluded the public from his place of manufacture. In the storeroom whose location is above described some seventy kegs of beer were found. Two samples taken from this beer were analyzed, and one was found to contain four and two tenths per cent. of alcohol, and the other, three and eight tenths per cent. of alcohol. This "green" or "pale" beer, as it was called by the witnesses, was used by the defendant only as one of the ingredients in the manufacture of his non-alcoholic syrup. No evidence was introduced to show that this beer was an alcoholic or spirituous liquor, and there was no evidence that it was intoxicating.

From the foregoing evidence the State drew the conclusion that the defendant "did keep on hand at his place of business alcoholic and spirituous liquors;" the defendant denied that such conclusion followed from this evidence; and this constitutes the issue for determination by this court. In other words, we are called upon to declare the meaning, in the prohibition act, of the terms, "place of business," and "alcoholic" and "spirituous liquors." (Acts 1907, p. 81). What did the legislature mean when it made it a penal offense to keep on hand at a "place of business" "alcoholic" and "spirituous liquors"?

The cardinal canon of construction of a legislative act is that the intention, when ascertained, governs; and all other rules of interpretation are subordinate. And it is also well settled that the mere letter does not always express the intent. "A thing which is within the intention of the makers of the statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers." This thought has been quaintly expressed by Plowden in his Commentaries: "It is not the words of the law, but the internal sense of it, that makes the law.; and our law consists of two parts, viz., of body and soul; the letter of the law is the body of the law, and the sense and reason of the law are the soul of the law, quia ratio legis est anima legis. And the law may be resembled to a nut, which has a shell and a kernel within: the letter of the law represents the shell, and the sense of it the kernel; and as you will be no better for the nut if you make use only of the shell, so you will receive no benefit from the law if you rely upon the letter; and as the fruit and profit of the nut lie in the kernel and not in the shell, so the

fruit and profit of the law consist in the sense more than in the letter. And it often happens, that when you know the letter, you know not the sense, for sometimes the sense is more confined and contracted than the letter, and sometimes it is more large and extensive." Of course, in construing all statutes, in order to arrive at the intention of the legislature, the letter of the act must be first considered, giving to the words therein contained their usual, ordinary, and popular significance; and if the intention of the legislature can be gathered from the mere letter of the law, construction is excluded. But if the letter leaves us in doubt, the intention interprets the act; and this intention is also to be found in the evils sought to be remedied by the statute. The rule, approved by the wisdom of centuries, is, to consider the old law, the mischief, and the remedy. The old law authorized the manufacture and sale of intoxicating liquors. The mischief was the use of intoxicating liquors as a beverage. The remedy was prohibition by law of the manufacture and sale of intoxicating liquors, of all kinds and of every description, when used as a beverage. We now take up for decision the particular questions presented by this record, and endeavor to construe the statute in the light of these well recognized rules.

(1) What did the legislature mean by the phrase "place of business," in the prohibition act? In determining this question, let us consider the context, as showing the evil the law was designed to prevent. As before stated, the great underlying purpose of the statute was to prevent the evils of intemperance, and, in order to prevent these evils, to prohibit their cause, to wit, the manufacture and sale of intoxicating liquors. The first part of the act makes it unlawful to "sell or barter for valuable consideration, either directly or indirectly, . . any alcoholic, spirituous, malt or intoxicating liquors or intoxicating bitters or other drinks which, if drunk to excess, will produce intoxication." The second part of the act makes it unlawful to "give away to induce trade at any place of business" such liquors. And the third part of the act makes it unlawful to "keep or furnish at any other public places" such liquors. The fourth part makes it unlawful to "manufacture" such liquors; and the fifth part, which is now under consideration, makes it unlawful to "keep on hand at their place of business" any such liquors. Any doubt as to this fifth part must

be solved in the clear and explicit light of the other acts which the law makes unlawful. The purpose of the legislation is to prevent the evils of intemperance; and, to accomplish this, it prohibits everywhere within the limits of this State the sale or barter or manufacture of any intoxicating liquors. This prohibition, though very broad, was deemed not sufficiently so to entirely remedy the evil; for intoxicating liquors might easily be imported into the State and kept at places to which the public had access, and furnished at such places to the public, and thereby the beneficent purpose of the act would be utterly destroyed; and, therefore, it was made unlawful to "give away to induce trade at any place of business, or keep or furnish at any other public places," "or keep on hand at their place of business" any "alcoholic, spirituous, malt or intoxicating liquors or intoxicating bitters or other drinks which, if drunk to excess, will produce intoxication." Now, the use of the word "trade," as descriptive of the "place of business," certainly indicates a public place of business, where people congregate or go for the purpose of trading; and therefore, the temptation to intemperance shall not be held out at such places to people who go there. The use of the word "other," as descriptive of a "public place," clearly denotes that the place of business must be a public place. Bearing in mind, therefore, the clear meaning of a "place of business," as indicated by the use of the words "trade" and "any other public places," it is clear that the legislature meant that a place of business where it was unlawful to keep on hand intoxicating liquors was a public place of business. It certainly would be illogical to hold that the legislature meant to say that a place of business where intoxicating liquors could not be given away to induce trade must be a public place, and such place must be public because in no other character of place is trade carried on, and in the same act intended that the place of business where intoxicating liquors should not be kept on hand should be a different kind of place. It might be reasonably inferred by the legislature that although intoxicating liquor might not be given away to induce trade at a place of business, it nevertheless might be kept at such place of business for the purpose of drawing the public, thus affording an opportunity for evading the law, in that it would be difficult or impossible to prove the purpose for which it was kept. We think, therefore, the words "place of business,"

twice used in the act, bear, in each connection, the same signifi-
cance, and mean a place where people generally congregate for the
purpose of carrying on some sort of traffic, or where people are in-
vited or expected to come to engage in some sort of mercantile
transaction; and, therefore, the legislature, designing to prevent
the use of intoxicants, declared not only that such intoxicants could
not be manufactured or sold in the State, but also that they could
not be kept on hand at any public place in the State where people
have either the right to go as to a public place, or where they
are expected to go as to a place of business; and by these means
it sought to prevent the public from in any manner having the
opportunity to indulge in the use of intoxicating liquors as a bev-
erage. We can not believe that the legislature intended to use the
word "business" in its broadest sense, of occupation, vocation, or
employment. If these words in the statute, "place of business,"
mean the place where a man works, they embrace the private office
of the professional man, where the public is never admitted, and
no physician or dentist or druggist could keep any alcohol in a
private room connected with his place of business, for any purpose;
and the artist in his studio, and the writer in his library, and the
astrologer who reads the meaning of the stars at night, and the far-
mer who plows his land, could not keep on hand for any purpose any
intoxicating liquor. It would be absurd to say that the legislature
intended that the phrase "place of business," as used in this connec-
tion, should embrace workshops to which the public have no access,
studios, laboratories, and farms. The reasonable, common-sense con-
struction, giving to the words their usual and popular significance, is
that a "place of business," as used in the prohibition statute, means
a place where the public generally are expressly or impliedly in-
vited for the purpose of transacting business with the owner, and
that a mere storeroom to which the public are not invited, and
from which the public are excluded, is in no sense a place of busi-
ness within the meaning of the phrase "place of business" as
used in the prohibition statute, and the refusal of the court to
give an instruction to the jury as requested in the present case,
embracing the above definition of the words "place of business,"
was error.

In interpreting the words "place of business," in the prohibi-
tion statute, we have had the benefit of no judicial precedent ex-

actly in point. These words seem to have their origin in the Georgia statute, and do not occur in other statutes regulating or prohibiting the sale of intoxicating liquors. The language nearest in analogy, so far as we have been able to find, in other statutes, is "to keep on hand for the purpose of sale in public places." The judicial construction by the courts of those States that have somewhat cognate legislation to that now under consideration, on the subject of playing cards or gambling in public places or places of business, would seem to support the view that we have taken of this language in the statute sub judice. The term "public place," used in these statutes, as a general rule includes any place which for the time being is made public by the assemblage of people who go there with or without invitation and without restraint. The evil aimed at by these laws was the bad example to people by the public playing of cards; and in several cases "places of business" have been defined to be places to which the public are impliedly invited for the transaction of business during business hours, such places being deemed public places. Campbell *v.* State, 17 Ala. 369; Metzer *v.* State, 31 Tex. Cr. Rep. 11 (19 S. W. 254).

In every case, whether a place of business is a public place within the meaning of the statute is a question of fact, or a mixed question of law and fact, and should be submitted to the jury, under proper instructions from the court. Parker *v.* State, 26 Tex. 204. In instructing the jury, therefore, in this case that the facts proved constituted a place of business, we think the learned judge of the trial court invaded the province of the jury.

(2) Keeping in mind the maxims of construction referred to in the first part of this opinion, we now come to the second question presented by the record. The defendant was charged with "keeping on hand at his place of business alcoholic and spirituous liquors." The court was requested to instruct the jury that these words in the accusation meant "alcoholic and spirituous liquors that will produce intoxication when drunk to excess." The court refused to charge as requested on this subject, and charged as follows: "If the defendant kept on hand any spirituous or alcoholic liquors at his place of business, it could make no difference whether the liquors were in proper form to be used as a beverage or not; the statute condemns the keeping on hand of liquors which fit this description, and it refers to any liquid which has such an appre-

ciable quantity of alcohol in it as to come under the term 'alcoholic liquors.'" This charge of the court was assigned as error because the statute refers only to such alcoholic and spirituous liquors as, when drunk to excess, will produce intoxication. It seems manifest that the law, which has for its purpose the suppression of the evils of intemperance, can not be violated by selling or keeping on hand at a place of business liquids which can not be used as a beverage; for that which can not be drunk can not produce drunkenness, and liquors which can not be used as beverages do not fall either within the letter or the spirit of the act. In the use of the phrase "alcoholic or spirituous liquors," only those liquors are included which contain a sufficient quantity of alcohol (the intoxicating element of all liquors) to produce intoxication when drunk to excess. The words "alcoholic or spirituous liquors," as used in the statute, necessarily import intoxicating liquors. This is a definition which the Supreme Court has given similar words in cognate statutes. In the case of *McDuffie* v. *State*, 87 *Ga.* 687 (13 S. E. 596), the court held that "all spirituous liquors are intoxicating;" and in *Bell* v. *State*, 91 *Ga.* 227 (18 S. E. 288), it was held that all alcoholic liquors are intoxicating. According to these decisions, which are in consonance with reason and the intention of the act, liquors are neither alcoholic nor spirituous unless they are also intoxicating. It seems to us absurd and utterly unreasonable to say that a trace of alcohol in a liquid, not enough to intoxicate, or a liquid not in proper form to be used as a beverage, fits the description, given in this statute, of "spirituous and alcoholic liquors." Such interpretation of the law is so extreme as to recall the illustration of the common-law writers, of the ridiculous construction of a statute, that the language, "Whoever draws blood in the streets shall be punished with the utmost severity," included a surgeon who opened the vein of a person who had a fit in the street, in order to save his life. This view of the law is satisfied with the "shell of the nut," losing sight entirely of the "kernel." Qui hæret in litera hæret in cortice. This construction of the law would call a liquid that contained an ounce of whisky in a barrel of water and a teaspoonful of sugar a whisky toddy; or an ounce of brandy in a barrel of milk, a milk punch. This construction would prohibit the sale of what are commonly known as "soft drinks," that contain only an appreciable amount

of alcohol, not enough to produce intoxication, however much is drunk, as a beverage; and would banish from the drug stores all drugs and medicines and all culinary and toilet articles which contain any alcohol, even when it is well known that such things are not only not in proper form to be used as beverages, but, if so used, would cause death.

It has been held by the Supreme Court in *Bradley* v. *State,* 121 *Ga.* 206 (48 S. E. 981), and by this court in *Mason* v. *State,* 1 *Ga. App.* 534 (58 S. E. 139), that the words "intoxicating liquors," or "alcoholic and spirituous liquors," as used in prohibition statutes, include liquors intended for use as a beverage or capable of being so used, containing alcohol, obtained either by fermentation or distillation, or both, in such a proportion as would produce intoxication when drunk to excess. And it was further held in these decisions that medicinal, toilet, and culinary preparations, recognized as such by standard authorities, and generally used as medicines, and not reasonably capable of use as intoxicating beverages, are not to be regarded as within the meaning of the expression "intoxicating liquors," although such articles are liquid, contain alcohol, and may produce intoxication. The courts will take judicial notice of the uses and character of these articles, and, even though they contain alcohol in sufficient quantity to produce intoxication if drunk to excess, that they were not intended to be drunk at all; and the people are not to be deprived of their salutary uses because they might be reached by the letter of a law whose sole and vital purpose is the prevention of intemperance in the use of intoxicating liquors as a beverage. Of course, any evasion of the statute, in the form of medicine (whether "cordial," "bitters," or "tonic") which is really in fact and in substance an intoxicating liquor, not only capable of being used as a beverage, but so intended, would be readily detected by an intelligent jury, and promptly and severely punished by a discriminating court. But we think that the whole purpose and intention of the prohibition statute is summed up and tersely expressed in the act as follows: "Nor shall it be lawful in the limits of said State for intoxicating liquors to be sold in dispensaries, and the sale of intoxicating liquors in said State shall be prohibited to private persons and to the State, its officers and agents." Prohibition is not a crusade against the use of medicines, household remedies, culinary and toilet arti-

cles, and all "soft drinks." It is a crusade against the multiform evils and intemperance caused by the use of intoxicating liquors as a beverage, and, therefore, a crusade against vice and crime greater in extent and enormity than the combined evils of war, pestilence, and famine. If the first interpretation is correct, then prohibition is the impracticable and unreasoning crusade of fanaticism. If the second, it is a crusade as unselfish and as holy in its purpose as that which inspired the tongue of Peter the Hermit or nerved the arm of Richard the Lion-hearted.

That the construction here placed upon the prohibition statute is the rational one, and is the one in harmony with the great purpose of the legislature in passing the act, we think, can not be doubted. Any other construction would be a perversion of the purpose of the act, and would be in contravention of the constitutional right of the citizen. The right to regulate or prohibit the manufacture and sale of intoxicating liquors for use as a beverage is well established as being within the exercise of the police powers of the State to protect the public against the evils which result from the excessive use of ardent spirits. But to say that the legislature has a right to forbid the manufacture or sale of every liquid, regardless of the amount of alcohol it contains, or regardless of the presence of other ingredients, which prevent any use of the liquid as a beverage, is to give an elastic construction to the right of legislation, not warranted by the constitution or laws, or supported by any respectable authority. The writer of this opinion, speaking for himself alone, does not hesitate to say that such a construction, if imperatively demanded by the language of the statute or the intention of the lawmakers, would carry the statute beyond the power of the legislature. In the language of Mr. Justice Brewer, in construing the Kansas statute prohibiting the sale of intoxicating liquors, "I do not think the legislature can prohibit the sale or use of any article whose sale or use involves no danger to the general public. The habits, the occupation, the food, the drink, the life of the individual, are matters of his own choice and determination, and can be abridged or changed by the majority speaking through the legislature only when the public safety, the public health, or the public protection requires it." Intoxicating Liquor Cases, 25 Kan. 765 (37 Am. R. 284). But, as we have attempted to show in this opinion, we are perfectly clear that the

legislature, in enacting the prohibition statute, was aiming to prevent the evil of intemperance caused by the use of intoxicating liquors as a beverage. To accomplish this beneficent purpose, the law should receive a reasonable construction, equally removed on the one hand from a harsh, literal interpretation which would render it unpopular and difficult of enforcement, and, on the other hand, from a latitude that would tend to fritter away its beneficial purpose and cause it to become a mere brutum fulmen.

*Judgment reversed.*