[Crim. No. 17. Fourth Appellate District.—June 27, 1930.]

THE PEOPLE, Respondent, v. BELLA MINTZ et al., Appellants.

John Beardsley for Appellants.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

STROTHER, J., *pro tem.*—The appellants were charged, in the first count of the information, with a violation of the provisions of section 403a of the Penal Code; in the second count, with a conspiracy to violate the provisions of that section. The defendant Yetta Stromberg was found guilty upon the first count, and all of the defendants appealing were found guilty upon the second count. From the judgments upon conviction these defendants appeal.

The part of section 403a necessary to be considered in passing upon the questions raised by the appeal, reads as follows:

"Any person who displays a red flag, . . . in any meeting place, . . . as an aid to propaganda that is of a seditious character is guilty of a felony."

We shall consider first the question raised as to the sufficiency of the second count of the information, upon which all of the defendants were convicted. It is agreed by the appellants, and admitted by respondent, that the judgment on this count, alleging a conspiracy, cannot be

sustained, for the reason that no overt act of the conspirators, in furtherance of the object of their alleged agreement, is charged.

"No agreement amounts to conspiracy, unless some overt act, besides such agreement, be done within this state, to effect the object thereof, . . . (Pen. Code, sec. 184)."

"Upon a trial for conspiracy . . . the defendant cannot be convicted unless one or more overt acts are expressly alleged in the indictment or information, . . . (Id., sec. 1104)."

This disposes of the case except as to the judgment against defendant Yetta Stromberg upon the first count.

In the briefs filed by appellants it was urged that the trial court committed errors in the charge to the jury, but in the oral argument to this court their counsel stated that he was satisfied that the instructions were correct, and waived any claim of error on that account.

From the evidence introduced at the trial it appears that there was an organization in the city of Los Angeles known as the Pioneer Summer Camp Conference, an association composed of independent organizations, some of which were communistic in character, the others having members who were communists. The purpose for which the Camp Conference was organized was to establish a summer camp for children of the so-called "working class."

Several meetings of the Conference were had to make arrangements for the camp and its organization, which were concluded at a meeting held on July 8, 1929. Grounds for the camp were based on the hills in San Bernardino County, and it was established with the gathering together there of a number of children under the care of the defendants, and the leadership of the defendant Stromberg, who was a member of one of the communistic organizations composing the Camp Conference. In the minutes of the meeting on the above date which were introduced in evidence, as part of the directions for preparation for the camp appears this entry:

"Library: Need pamphlets and books. Try to get some at Communist Party Headquarters."

In the conduct of the daily camp program, the first order was that the children, when they arose about 6:30 in the morning, stood by their cots and saluted a red flag on

which was a device of sickle and hammer, and announced themselves "ready." This flag-raising ceremony was under the direction of the defendant Stromberg. The flag used was shown to be the flag of the communist party, and of the "Third International," with which the party was affiliated, and of the Soviet Government of Russia. This defendant, as a witness for the defendants, testified that she had instructed the children in taking the communist pledge, which was in these words:

"I pledge allegiance to the workers' red flag, and to the cause for which it stands, one aim throughout our lives, freedom for the working class."

In the camp library were found a number of leaflets, tracts and papers of communistic literature, contributed by participating organizations, which were introduced in evidence over the objection of the defendants. This library was in charge of the defendant Stromberg. There was no evidence that any of the books or papers were ever read by the children. It does appear, however, that there were daily study hours, conducted by the defendant Stromberg, in which history from the communistic standpoint was taught.

Excerpts from these exhibits were read to the jury over defendants' objection, many of them advocating armed force to overthrow the present economic and governmental organization of the country. One quotation will illustrate many of the propositions either openly stated or broadly suggested by the texts.

"Communists do not think it necessary to conceal their views and intentions. They openly declare that their goal can be achieved only by the violent overthrow of the whole of the present social system."

All of these documents were properly admitted in evidence as tending to show that the camp was conducted as a school of armed revolutionary propaganda and that the flag was exhibited as a symbol of that teaching, and the evidence, if believed by the jury, was sufficient to support their verdict.

It is contended also that the evidence was insufficient because it was not proven that the place where the camp was located was a "public place." The expressions "public place" and "meeting place" are used in the statute in

the alternative. It is sufficient to say that it could hardly be claimed that the place where these children and their attendants and instructor met was not a "meeting" place, whether it was public or not.

Misconduct on the part of the district attorney in his argument to the jury is laid as one of the grounds for reversal of the case. The district attorney began a statement that the trial was being watched with great interest not only by citizens of the county, but of the state and nation, when he was interrupted by defendants' counsel with an objection. The judge struck out the statement, and admonished the jury to disregard it, as there was no such evidence before them, and instructed the district attorney to confine himself to the evidence. It is not likely that any jury would be much impressed by such a remark, and the prompt action of the court would certainly have dispelled any prejudicial effect on their minds.

A number of other statements of the district attorney are cited in support of appellants' contention, but, while some of them were rather florid and had perhaps as well have been left unsaid, we do not think them of such a character as to have been prejudicial to the right of the defendants to a fair trial. No objection to any of these statements was made at the time, and they cannot, for that reason, be considered on this appeal. (*People* v. *Ong Mon Foo,* 182 Cal. 697 [189 Pac. 690] ; *People* v. *Steelik,* 187 Cal. 361 [203 Pac. 78].)

During a midday recess of the court one of the jurors was seen by appellants' counsel in conversation with a witness for the prosecution. This conversation is assigned by appellants as misconduct of the juror, for which they should have been granted a new trial. After the recess, appellants' counsel cross-examined the witness, who gave a circumstantial account of the conversation. There was nothing in it from which it might be even remotely inferred that it could have influenced the juror, as the subject of the trial was not mentioned between them.

Appellants contend that the trial judge was guilty of prejudicial misconduct in cross-examining one of the defendants other than the defendant Stromberg. The questions asked were whether the witness had ever forbidden or discouraged the children from taking a pledge to the flag

which the defendants were charged with displaying, or knew of any order having been given to them by anyone in charge of the camp, forbidding the display of the flag or pledge of allegiance to it. There was nothing in the form of the questions suggesting any prejudice on the part of the judge, and as appellants' counsel states that he was eminently fair in his attitude toward the defendants throughout the trial the incident could have had no prejudicial effect on the minds of the jury.

The final contention of appellant is that section 403a is void as in contravention of the Fourteenth Amendment to the federal Constitution and of section 9 of article I of the California Constitution. The part of the Fourteenth Amendment which might be applicable to the case is the provision that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

Among these privileges, undoubtedly, are the rights of free speech and of lawful assembly, which are guaranteed by our state Constitution. No matter how revolutionary, in the general sense, a doctrine may be, of our present form of government, if its adoption in practice is advocated by peaceful and constitutional means,—and our Constitutions, state and national, provide the means,—the open and public advocacy of such doctrine cannot be interfered with.

But it is inconceivable that the state has not the right to prohibit by penal laws the wilful and deliberate training of traitors to itself under the guise of protection of the right of free speech, particularly, as in this case, among those who by reason of youth and inexperience have no chance to form an independent judgment. Appellants' counsel concedes that sedition laws which "interdict against the use of force or violence" are consistently upheld by the courts, and all of the authorities cited by him support that proposition.

"Any person who displays a red flag, . . . in any meeting place, . . . as an aid to propaganda that is of a seditious character is guilty of a felony."

Sedition is defined as the stirring up of disorder in the state, tending toward treason, but lacking an overt act. Certainly the "advocacy of force or violence" in overturning the government of a state falls within that definition.

The statute is constitutional, and the conviction under it must be upheld.

The judgment of conviction of the defendants on the second count of the information is reversed.

The judgment of conviction of the defendant Yetta Stromberg on the first count of the information is affirmed.

MARKS, J., Concurring and Dissenting.—We concur and dissent.

We concur in the foregoing opinion in sustaining the judgment of conviction of Yetta Stromberg, and in the conclusion reached that the judgment of conviction of all appellants under the second count of the information cannot be sustained.

We dissent from the order reversing their convictions under this count without directing the trial court to grant their motion for new trial.

This prosecution was instituted under section 403a of the Penal Code which provides as follows:

"Any person who displays a red flag, banner or badge or any flag, badge, banner, or device of any color or form whatever in any public place or in any meeting place or public assembly, or from or on any house, building or window as a sign, symbol or emblem of opposition to organized government or as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character is guilty of a felony."

As the judgments against all of the defendants under the second count of the information must be reversed, leaving only the conviction of Yetta Stromberg under the first count to be considered, we will hereafter refer to her as the appellant.

The camp at which the red flag was displayed, was established on a ranch near Yucaipa several miles from Redlands in San Bernardino County. This camp provided board and lodging for children. It was promoted, organized and managed by a camp conference, which was composed of four delegates from each of six groups, most of which were affiliated with the Communist Party. This party has been functioning for some time as a political party under the name of the Workers (Communist) Party. In his brief, appellant's counsel describes her as follows:

"Only one of the defendants, Yetta Stromberg, who celebrated her 19th birthday at the camp in July, was a member of the camp conference which was responsible for the establishment and maintenance of the camp. Miss Stromberg might perhaps be termed the intellectual leader of the enterprise. She is an American girl, born of Russian parents at Cleveland, Ohio. She was graduated from Roosevelt High School in Los Angeles, and had had about one year in the University of California at Los Angeles. She is a member of the young Communist League and was a delegate from that body to the camp conference. At the camp she had charge of the educational hour, during which the children were instructed in economics and history and sociology and labor unionism. Among other things the children were taught class-consciousness, the solidarity of the workers and the theory that the workers of the world are of one blood and brothers all. This oneness of blood was symbolized by the red background of the flag of Soviet Russia, upon which background was superimposed a likeness of a sickle and hammer. The sickle, Miss Stromberg said, represented the farmers and the hammer represented the Industrial Workers.

"Beginning some days after the opening of the camp and continuing regularly thereafter until the camp was closed, the children, under the direction of Miss Stromberg, about seven o'clock each morning, stood at salute beside their beds in the open air while a camp-made representation of the red flag of Russia was raised on an orange tree prop serving as a flag pole upon a high spot a few hundred feet from the children's beds. In unison the children recited their pledge to the flag."

The red flag which was displayed at the camp and which the children saluted, and to which they pledged their allegiance under the guidance and direction of appellant, was the flag of the Communist Party, as well as the flag of Soviet Russia.

A library was maintained at the camp under the charge of appellant. A number of the exhibits taken therefrom bore appellant's name, some in her own handwriting, and on others her name appeared in the writing of an undisclosed person. She admitted ownership of a number of them.

■ Appellant's contention that section 403a of the Penal Code is unconstitutional on the ground that it is an unwarranted limitation on the right of free speech guaranteed to the people by the Constitutions of the United States and of the state of California, deserves serious consideration. She directs her argument to the phrase in section 403a of the Penal Code; "of opposition to organized government." If opposition to organized government were the only act prohibited by this section we might be forced to agree with appellant. "Opposition" is a word broad in its meaning. It has been defined as follows:

"The act of opposing or resisting; antagonism. The state of being opposite or opposed; antithesis; also, a position confronting another or a placing in contrast. That which is, or furnishes an obstacle to some result; as, the stream flows without opposition. The political party opposed to the ministry or administration; often used adjectively; as, the opposition press."

It might be construed to include the peaceful and orderly opposition to a government as organized and controlled by one political party by those of another political party equally high minded and patriotic, which did not agree with the one in power. It might also be construed to include peaceful and orderly opposition to government by legal means and within constitutional limitations. Progress depends on new thought and the development of original ideas. All change is, to a certain extent, achieved by the opposition of the new to the old, and in so far as it is within the law, such peaceful opposition is guaranteed to our people and is recognized as a symbol of independent thought containing the promise of progress. It may be permitted as a means of political evolution, but not of revolution. This section, however, goes further than prohibiting opposition to organized government, and forbids the display of any flag, badge, banner or device "as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character."

The words "anarchy" and "sedition" have well defined meanings, and the teaching of anarchy and sedition as understood by the laws of our land can well be prohibited by a constitutional statute. Webster's Dictionary defines an anarchist as follows:

"One who advocates anarchy or believes in anarchism; one who attempts to establish anarchy; especially one who believes in or practices terroristic anarchism; a terrorist; a nihilist."

The same authority defines anarchy as:

"Absence of government; the state of society where there is no law or supreme power; hence, a state of lawlessness or political disorder; specifically, the social state that is advocated by modern anarchists."

Black's Law Dictionary, second edition, at page 68 defines an anarchist as:

"One who professes and advocates the doctrine of anarchy." The same authority defines "anarchy" as:

"Destructive of government, lawlessness; the absence of all political government; by extension, confusion in government."

In *Cerveny* v. *Chicago Daily News,* 139 Ill. 345 [13 L. R. A. 864, 28 N. E. 692], the court said:

"It was charged that the defendant falsely and maliciously published of the plaintiff language which is literally transcribed in the declaration charging that the plaintiff is an 'Anarchist.' An 'anarchist' is defined by Webster to be: 'An anarchist; one who excites revolt, or promotes disorder in a state,' and this we assume to be a sufficiently accurate definition of the word. It is, moreover, here alleged that, at the time and place of the publication complained of, it was commonly understood and believed that 'the doctrines, opinions, beliefs, teachings, and tenets of said class, party, or sect called 'anarchists,' as aforesaid, and of the persons composing said class, party, or sect, is that the law and order of society then, and ever since then, and now, existing should be overthrown by revolution and force.' It cannot, therefore, be correctly said that this is no more than charging the plaintiff with being a member of a certain political party; for anarchy, being the enemy of all governments, is necessarily the reverse of a political party, which is always in support of some form of government, and, professedly, of that which is best."

In *Lewis* v. *Daily News Co. of Cumberland,* 81 Md. 466, [29 L. R. A. 59, 32 Atl. 246], the court said:

"Falsely publishing of an individual that he is an anarchist is libelous." (*Cerveny* v. *Chicago Daily News,* 139

Ill. 345 [13 L. R. A. 864, 28 N. E. 692].) ''The declaration alleges that an anarchist is universally accepted by all law abiding persons in all countries as meaning an enemy and conspirator against all law and social order, and as one who uses unlawful, violent, and felonious means to destroy property and human life, and as one who is treasonable to the government under which he lives and employs assassination of persons in authority as means of accomplishing his unlawful designs against society. Obviously, then, to publish of and concerning an individual that he is such an enemy of law, of order, of society, and of human life, is grossly libelous, and is far from merely charging him, as suggested in the argument, with being only a political propagandist, advocating visionary schemes; for anarchy, as defined in the declaration, and as generally understood, is avowed hostility to all governments, and open antagonism to all political parties, every one of which professes to support some form of government, and generally that which its members consider the best. It cannot be doubted that all law-abiding, right-thinking men regard with abhorrence the individual who justifies or approves of the bloody and atrocious means to which anarchists resort, the world over, in furtherance of their reckless and revolutionary designs, against every form of government and against every right of property. It is equally apparent that to accuse another of being an anarchist in the sense in which the term is generally accepted is to accuse him of that which will inevitably injure his reputation, and expose him to obloquy and ignominious reproach.''

In *People* v. *Most,* 36 Misc. Rep. 139 [73 N. Y. Supp. 220, 222], the court said:

''We hold that the teachings of the doctrine of anarchy, 'seriously disturb or endanger the public peace'; and also 'openly outrage public decency.' To give this construction to the law in no way abridges the liberty of conscience in matters of religion, nor the freedom of speech on all questions of government or of social life, nor does it in any way trespass upon the proper freedom of the press. The point and pith of the offense of anarchists is that they teach the doctrine that the pistol, the dagger, and dynamite may be used to destroy rulers. The teaching of such horrid methods of reaching an end is the offense. It is poor

satisfaction, when one of their dupes has consummated the results of their teaching, to catch him, and visit upon him the consequences of his acts. The evil is untouched if we stop there. In this class of cases the courts and the public have too long overlooked the fact that crimes and offenses are committed by written or spoken words. We have been punishing offenders in other lines for words spoken or written without waiting for an overt act of injury to persons or property. The press is restrained by the law of libel from the too free use of words. Individuals can be punished for words spoken or written, even though no overt act of physical injury follow. It is the power of words that is the potent force to commit crimes and offense in certain cases. No more striking illustration of the criminal power of words could be given, if we are to believe the murderer of our late President, than the event presents. The assassin declares that he was instigated and stimulated to consummate this foul deed by the teachings of Emma Goldman. He is now awaiting execution for the crime, while she is still at large in fancied security. A person may advocate any change of our government by lawful and peaceful means, or may criticize the conduct of its affairs, and get as many people to agree with him as he can, so long as he does not advocate the commission of crime as the means through which he is to attain his end. If he advocates stealthy crime as the means of reaching his end, he by that act, commits a crime for which he can be punished. The distinction we have tried to point out has been too long overlooked. If our conclusions are sound, it is the teachers ot fhe doctrine who can and ought to be punished. It is not necessary to trace and establish the connection between the teaching of anarchy and a particular crime of an overt nature. It is a strange spectacle in this age for a great nation to stand mute and paralyzed in the presence of teachers of crime that are advocated only for the purpose of destroying such nation, and it have no power to defend against such internal enemies. We do not believe the arm of the law is too short to reach those offenders against the life of the nation, or too paralyzed to deal with them. The liberty of conscience, the freedom of speech, or the freedom of the press, do not need such

concessions to save to the fullest extent unimpaired those sacred rights of a free people.''

It is, therefore, clear that when section 403a of the Penal Code prohibts a display of a red flag as an invitation or stimulus to anarchistic action it prohibits acts which have a well-defined and well-settled meaning in the law of our land, a teaching which, if allowed to be put into force and effect, would mean revolution in its most dreaded form.

The section in question also prohibits the display of a red flag as an aid to propaganda that is of a seditious nature. Black's Law Dictionary, second edition, page 1067, gives the following definition of ''sedition'':

''An insurrectionary movement tending towards treason, but wanting an overt act; attempts made by meetings or speeches, or by publications, to disturb the tranquillity of the state.''

So, also, in *Wilkes* v. *Shields,* 62 Minn. 426 [64 N. W. 921], the court said:

''The obvious meaning of the words 'seditious agitator,' as they would naturally be understood by ordinary men, when published in reference to another is that he is a disturber of the public peace, and order, a subverter of just laws, and a bad citizen.''

In the case of *Arizona Pub. Co.* v. *Harris,* 20 Ariz. 446 [181 Pac. 373], ''sedition'' is defined as follows:

''Sedition is the raising of commotion or disturbances in the state; it is a revolt against legitimate authority.''

We therefore conclude that the term ''sedition'' and the word ''seditious'' have well-defined meanings in law. That the teaching of sedition against our government can be, and has long been prohibited, needs no further citation of authorities.

As we view the provisions of section 403a of the Penal Code, its prohibition of displaying a red flag ''as an invitation or stimulus to anarchistic action or as an aid to propaganda that is of a seditious character'' is certain, and a proper and constitutional and legislative enactment. It is not contrary to the provisions of either the state or federal Constitutions guaranteeing freedom of speech to our people.

The constitutionality of the phrase of this section, "of opposition to organized government" is questionable. This phrase can be eliminated from the section without materially changing its purposes. The section is complete without it and with it eliminated it can be upheld as a constitutional enactment by the legislature of the state of California.

■ "Where only part of a statute is invalid for any reason, in order to render the whole statute void for the same reason, all of the parts thereof must be so interdependent as, that no one part may be eliminated without destroying the force of the whole statute; but where a statute is valid in one part, and invalid in another, the former part, if not dependent in any measure upon the latter, and can without the latter, accomplish one or all the material purposes of the act, will be sustained, and that which is void will be eliminated and disregarded. It follows that the court will not declare an entire act unconstitutional where the objectionable part can be eliminated without destroying the efficacy of the remainder. The effect of such partial invalidity will then be, that the independent provision, not in its nature and connections essential to the law, may be treated as a nullity, leaving the rest of the enactment, if it comprehend within itself an entire and complete scheme, to stand as valid." (5 Cal. Jur. 644; *Mordecai* v. *Board of Supervisors*, 183 Cal. 434 [192 Pac. 40]; *Hunt* v. *Superior Court*, 178 Cal. 470 [173 Pac. 1097]; *Ex parte Gerino*, 143 Cal. 412 [66 L. R. A. 249, 77 Pac. 166]; *Johnson* v. *Tautphaus*, 127 Cal. 605 [60 Pac. 172]; *Murphy* v. *Pacific Bank*, 119 Cal. 334 [51 Pac. 317]; *Christy* v. *Supervisors of Sacramento County*, 39 Cal. 3; *People* v. *Barbiere*, 33 Cal. App. 770 [166 Pac. 812]; *In re Mitchell*, 19 Cal. App. 567 [126 Pac. 856]; *Maclay* v. *Love*, 25 Cal. 367 [85 Am. Dec. 133]; *Matter of Bonds of San Joaquin Irr. Dist.*, 161 Cal. 345 [119 Pac. 198]; *McGowan* v. *McDonald*, 111 Cal. 57 [52 Am. St. Rep. 149, 35 Pac. 418].)

■ Appellant next contends that the verdict is contrary to the evidence and is not supported by the evidence. She bases this contention upon three separate arguments; first, that the place in which the red flag was displayed was not a public place as the term is used in section 403a

of the Penal Code. Second, that it was not a meeting place in the sense that the term is used in the same section; third, that the evidence admitted fails to prove that the red flag was a sign, symbol, or emblem displayed "as an invitation or stimulus to anarchistic action, or as an aid to propaganda that is of a seditious character."

A meeting place has been defined by the Supreme Court of Alabama in the case of *Finnem* v. *State,* 115 Ala. 106 [22 South. 593], as including a place in a woods half a mile from the public highway, where a number of persons meet for the purpose of engaging in a prohibited activity. The following cases are to the same effect: *King* v. *Brown,* 100 Tex. 109 [94 S. W. 328]; *Farrell* v. *City of Opelika,* 144 Ala. 135 [39 South. 249]; *Roberts* v. *State,* 4 Ga. App. 207 [60 S. E. 1082]; *People* v. *Whitman,* 157 N. Y. Supp. 1107; *O'Mally* v. *McGuinn,* 53 Wis. 353 [10 N. W. 515].

A "meeting" is defined by Bouvier's Law Dictionary, third edition, volume two, as follows:

"A number of people having a common duty or function who have come together for any legal purpose, or the transaction of business of a common interest; as an assemblage."

Bouvier defines an "assembly" as: "The meeting of a number of persons in the same place. An assembly of persons would seem to mean three or more."

The evidence in this case shows that there were present at the camp at which the red flag was displayed, all of the defendants to this action, and a number of children, also that there were various adults visiting the camp at different times. The camp was situated upon a farm of about sixty acres, leased from the owner for the purpose of holding these assemblages. It was about one mile from the public highway and was reached by a private road. The flag was displayed each morning in the presence of the children. Under these facts we believe that it was displayed at a public place which was also a meeting place as we have heretofore defined the terms.

▮▮▮▮ A casual reading of the exhibits before us containing quotations from literature found in the library at the camp which was admittedly under the control of appellant, convinces us that the red flag was raised "as an invitation and stimulus to anarchistic action, and as an aid

to propaganda that was of a seditious character.'' We have selected at random three quotations from these pamphlets. They are as follows:

"This year is the 150th anniversary of the American revolution of 1776. If the average conscious worker is asked whether the American working class should commemorate the anniversary, his answer is an indignant 'No.' 'It was a bourgeoisie revolution,' he will declare. 'It created our present capitalist government. The constitution is a capitalist constitution. The Declaration of Independence is bunk. The revolutionary fathers represented the interests of landowners, merchants and capitalists. It's not our revolution; it gave the working class nothing but exploitation. We have nothing to commemorate.' . . . 'This year, on the 150th anniversary of the American revolution of 1776 it is time that the American working class begins to 'discover America' and its body of native revolutionary traditions. It is time that we grew up and like the youthful Lenin disputed with the bourgeoise for our heritage. We are the revolutionaries of our day and they the counter-revolutionists. In the words of Lenin we can say: 'We are definitely more consistent and truer guardians of the inheritance than you.' And to the 'back to the 1776-ers' the Norman Thomases and LaFollettes we can add in the words of Lenin: 'To keep the inheritance by no means signifies that one must limit himself to what he has inherited.' 'Back to nothing,' we can answer. 'We use the past to build the future, not to block the present. Forward to Communism. . . . After all it is only the first American Revolution.' The chief form of the December movement in Moscow was a peaceful strike and demonstrations. The overwhelming majority of the working masses' activity participated only in these forms of struggle. But just this December action in Moscow has shown plainly that the general strike as an independent and main form of struggle has outlived itself, that the movement with elemental, unrestrainable force surges out of these narrow frames and creates the highest form of struggle—the uprising. The change in the objective conditions of the struggle demanding the transition from the strike to the uprising, was sensed by the proletariate earlier than by its leaders. Practice, as always, went ahead of

theory. Peaceful strike and demonstration all at once ceased to satisfy the workers, who asked: 'What next?' Who demanded more aggressive action. The directive to construct barricades came to the outlying regions with enormous delay while barricades were already being constructed in the center. The working masses set to work, but were not satisfied with that, and—asking: What next? they demanded aggressive action. We, the leaders of the social-democratic proletariate, showed ourselves in December to be like that chief of the army who so absurdly disposed his regiments that the greatest part of his troops did not participate actively in the battle. The working masses looked for and did not find directives in regard to mass action. Therefore, there is nothing more shortsighted than the view of Plekhanov which was seized upon by all opportunists, that it was not advisable to begin an untimely strike, that 'they should not have resorted to arms.' On the contrary it was necessary more resolutely, energetically and aggressively to resort to arms; it was necessary to make clear to the masses the impossibility of a mere peaceful strike alone, and the necessity of a fearless and ruthless armed struggle. And now we must finally, openly and to everybody's hearing, acknowledge the insufficiency of political strikes, must agitate among the very broadest masses for the armed uprisings, not covering up this question with any sort of 'preliminary stages' not throwing any veil over the question. To hide from the masses the indispensability of a desperate, bloody, destructive war as the immediate task of the coming action, means to deceive both oneself and the people. In considering the status of the capitalist order as a world system we can say that American capitalism is the most powerful force fighting against proletarian revolution. The Role of the Party. This fact is emphasized by the Communist International in its resolution on the controversy within our Party. The role which American capitalism is playing in the struggle against the proletarian revolution, places a great responsibility on the Workers (Communist) Party. It is our task to carry on the revolutionary struggle against this mighty capitalist power to mobolize the workers against it, and finally to overthrow and destroy it.''

Again we read:

"Working men and working women! Exploited and oppressed peoples! Remember that the capitalist world is preparing a new imperialist war and a counter-revolutionary crusade against the first proletarian dictatorship of the world, the fatherland of the international working class. Do not believe the liars in the ranks of the social democracy who wish to lull you into a sense of false security with empty phrases concerning the peaceful intentions of those capitalist states which are even at this moment preparing a new war. Prepare yourselves to turn the counter-revolutionary war against the Soviet Union into a war against imperialism, into a civil war against the bourgeoisie in your own countries. Workers of the world! The Communist International appeals to you to join in a joint struggle against capitalist exploitation, against the yoke of imperialism, against the dictatorship of the bourgeoisie, against the preparation of new imperialist wars and interventions, against the pacifist lies and against the social democratic unity with the bourgeoisie and in favor of the class unity of the proletariat in its struggle against imperialist slavery, against the oppression of the colonial and semi-colonial peoples, against reformism and against facism, for the proletarian revolution! Long live the proletarian dictatorship in the Soviet Union! Long live the proletarian world revolution! Long live the world dictatorship of the proletariat! Long live world communism! Moscow, 2nd March, 1929. The Executive Committee of the Communist International.

"The conquest of power by the proletariat is not the peaceful 'conquest' of the existing bourgeois State machine by means of a parliamentary majority. The conquest of power by the proletariat is the violent overthrow of bourgeois power, the destruction of the capitalist state apparatus (bourgeois armies, police bureaucratic hierarchy, courts, parliaments, etc.) and its replacement by a new organ of proletarian power, primarily as a weapon for the suppression of the exploiters.

"When the revolutionary tide is flowing, when the dominant classes are disorganized, the masses are in a state of revolutionary ferment, the intermediary strata are inclining towards the proletariat, and the masses are prepared for action and for sacrifice, the task of the Party, of the

proletariat is to lead the masses into the direct attack upon the bourgeois State. This is to be achieved by propaganda in favour of all transitional slogans (Soviets, workers' control of industry, the slogan of peasant committees for the seizure of the landlords land, etc.), and the organization of mass actions, to which all other branches of Party work, agitation and propaganda, including parliamentary work, must be subordinated. This includes strikes, strikes combined with demonstrations, and combinations of armed demonstrations and strikes and finally the general strike conjointly with the armed uprising against the political power of the bourgeoisie. This struggle must be subjected to the rules of military art; it must be conducted according to a plan of war and in the form of a military offensive. It calls for the devoted loyalty and heroism of the proletariat. Such actions must be preceded by the organization of the broad masses in military units, which by their very form attract and set into action the maximum number of toilers (councils of workers' and peasants' deputies, soldiers' councils, etc.) and by intensified work in the army and the navy.

"Communists do not think it necessary to conceal their views and intentions. They openly declare that their goal can be achieved only by the violent overthrow of the whole of the present social system. Let the dominant clasess tremble before the Communist Revolution! The proletariat has nothing to lose but its chains! It has the whole world to gain! Workers of all countries, unite!"

Lastly we quote as follows:

"Have these gentry (the anti-authoritarians) ever seen a revolution? Revolution is undoubtedly the most authoritarian thing in the world. Revolution is an act in which one section of the population imposes its will upon the other by rifles, bayonets, guns and other such exceedingly authoritarian means. And the party which has won is necessarily compelled to maintain its rule by means of that fear which its arms inspire in the reactionaries. If the Commune of Paris had not relied upon the armed people as against the bourgeoisie would it have maintained itself more than twenty-four hours? Are we not, on the contrary, justified in reproaching the Commune for having employed this authority too little?"

In reading the foregoing extracts from the literature at the camp we must bear in mind that appellant was on the committee which organized and had charge of the camp, that she was present each time the red flag was raised and led the children in the pledge of allegiance to the flag ''and to the cause for which it stands,'' and that the literature from which we have quoted, discloses the cause for which the red flag stands, a cause which advocates wholesale murder in the most terrible form of revolution. Under these circumstances there is more than ample evidence to sustain the conviction of appellant, Yetta Stromberg.

The judgment against all of the defendants, under the second count of the information, who have appealed to this court, is reversed, with instructions to the trial court to grant their motion for a new trial so that appropriate action under this second count may be taken in accordance with the conclusions we have reached herein.

The judgment of the conviction of the appellant, Yetta Stromberg, under the first count of the information is affirmed.

Barnard, Acting P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 7, 1930, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 24, 1930.