## UNITED STATES v. GERMAN–AMERICAN VOCATIONAL LEAGUE, Inc. (and eight other cases).

### Nos. 8668–8676.

Circuit Court of Appeals, Third Circuit.

Argued July 27, 1945.

Decided Jan. 31, 1946.

Writ of Certiorari Denied April 29, 1946.

See 66 S.Ct. 976.

BIGGS, Circuit Judge, dissenting.

Frederic M. P. Pearse, of Newark, N. J.,
Anna B. Hogan and John P. Nugent, both

of Jersey City, N. J., and George C. Dix, of New York City (William W. Pellet, of New York City, George R. Sommer, of Newark, N. J., Mark Townsend, of Jersey City, N. J., G. Kenneth Brown, of New York City, on the brief), for appellants.

Richard J. Hughes, Asst. U. S. Atty., of Newark, N. J., and Edith Lowenstein, of Washington, D. C. (Thorn Lord, U. S. Atty., of Newark, N. J., on the brief), for appellee.

Before BIGGS, WALLER and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The nine appellants in this matter, including two corporations, were convicted under an indictment for conspiracy[1] to violate the Foreign Agents Registration Act of June 8, 1938 (McCormack Act), effective September 8, 1938, 52 Stat. 631, as amended by the Act of August 7, 1939, 53 Stat. 1244[2] and to defraud the United States. The conspiracy charged was to conceal the fact that the German-American Vocational League, Inc., hereafter called D.A.B., was a propaganda agency of the German Reich both directly and through other named German principals, by representing it as a social and fraternal organization to the end that it should not register as a foreign agency. The indictment was in two counts. The first was dismissed by the Court at the conclusion of the testimony. The case went to the jury on the second count.

The first point made by the appellants is that the Court erred in refusing to quash the indictment. The indictment is long and it is prolix but it does present an adequate picture of the essential elements of the crime charged and a conviction upon it would bar a second prosecution. United States v. Monjar, 3 Cir., 147 F.2d 916, certiorari denied 324 U.S. 859, 65

S.Ct. 1191. It is more specifically urged under the same argument that the alleged overt acts committed in the State of New Jersey were not to effect the object of the conspiracy and that therefore the District Court of the District of New Jersey had no jurisdiction. Among the New Jersey overt acts charged were:

"5. That on or about June 22, 1941, at said 'Bergwald,' in the State and District of New Jersey, and within the jurisdiction of this Court, the defendants Fritz Schroeder, Theodore Koehn, Joseph Lieblein and Albert Kiesler, and the co-conspirators Alfred Schuchmann, Kurt Fraebel and Heinz Schnoedewind, attended a meeting of the Board of Directors of said defendant. Vocational League and decided upon the abandonment of certain outward and notorious activities and manifestations of said Vocational League, at the same time deciding and agreeing together to continue in secrecy and in disguised form its newspaper, said 'In Retrospect' and its other propaganda activities in behalf of the foreign principals aforesaid.

"6. That on or about June 22, 1941, at said 'Bergwald,' in the State and District of New Jersey and within the jurisdiction of this Court, the defendants Fritz Schroeder, Theodore Koehn, Joseph Lieblein and Albert Kiesler, and the co-conspirators Alfred Schuchmann, Kurt Fraebel and Heinz Schnoedewind agreed together and with each other that said Vocational League would send a certain letter to its members."

Overt act No. 5 on its face shows a furthering of the conspiracy. The letter decided upon in overt act No. 6 is in evidence as are letters following it and testimony regarding it. A deliberate attempt to represent the D.A.B. as a loyal American organization and so avoid registering it as an agency of foreign principals

[1] The general conspiracy section under which the defendants were indicted is found in Title 18, U.S.C.A., § 88 and provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than

$10,000, or imprisoned not more than two years, or both."

[2] Section 612 of the McCormack Act found in 22 U.S.C.A. reads:

"Every person who is now an agent of a foreign principal shall, within thirty days after this Act takes effect, and every person who shall hereafter become an agent of a foreign principal shall forthwith file with the Secretary a registration statement, under oath, on a form prescribed by the Secretary which shall set forth * * *."

could be inferred from those items. As was said in Rumely v. United States, 2 Cir., 293 F. 532 at page 550, certiorari denied 263 U.S. 713, 44 S.Ct. 38, 68 L.Ed. 520: "An overt act is one which manifests the intention of the doer to commit the offense." In Kaplan v. United States, 7 F. 2d 594, also a Second Circuit decision, the defendants were charged with a conspiracy to violate the Bankruptcy Act, 11 U.S. C.A. § 1 et seq., by concealing assets. The overt act in that case sustained as sufficient was a conference at the office of a lawyer preceding the incorporation of the fraudulent company. The vicinage situation presented on this appeal is quite the reverse of that which appeared in United States v. New York Great A. & P. Tea Co., 5 Cir., 137 F.2d 459. Here, the two corporate appellants were organized under the laws of the State of New York. D.A.B. had its national headquarters in New York City. D.A.B. Recreational Resort, Inc. was the owner of Camp Bergwald in New Jersey which figured largely in the indictment and trial proofs. The trial was had at Newark, N. J., within ten miles of New York City. Not only does the indictment allege facts from which it affirmatively appears that the District Court had jurisdiction, but the entire record bespeaks the reasonableness from the standpoint of the defendants, of the trial being held in the New Jersey-New York area which undoubtedly had been the focal center of the questioned activity.

It is then urged that the Government failed to prove that a contract of employment existed between the German principals, or any of them, and D.A.B. which required the latter to file a registration statement. The theory of the appellants seems to be that there was an express contract in evidence [3] which was the only agreement proven; that it was not the type of contract which required the agency to register under the McCormack Act; that there had to be an express contract between

[3] That contract read:

"The German Labor Front
Foreign Organization

The Regional Director

Berlin SO 16
Engelufer 24–25
January 12, 1937.

To the
DAB, German American Vocational League
129 West 77th Street,
New York City, USA

My dear Sirs:

"In view of the fact that a large number of Germans of the Reich live in the United States of America, and have become members of the German Labor Front either by reason of former membership in a vocational association or have become members in the course of the past years, we have decided to request an American organization of similar formation to handle the affairs of these members.

"It is of great importance to us to know that our members in the United States are protected by an organization which has proved its reliability during its many years of existence, not only in its leadership and management, but also in its unobjectionable attitude toward the American State.

"We have decided to place the care and organizational unity of our members in your hands because we recognize in your Vocational League the best guarantee for their care and guidance in such a manner as is adequate, on the one hand, to their needs, and on the other hand, to the just provisions of the American government.

"We are happy that with this request, we can express confidence that the collaboration resulting from this relationship will work out for the benefit of the laboring classes who are citizens of the German Reich, and thereby will surely also be of advantage to the country in which they are at present guests.

"We shall reimburse you for the expenses incurred by you for potential employees through this relationship of our bank account in the United States, and reimburse you for your administrative work with 25% of the dues paid by our members. At the same time we undertake to pay for the social welfare of our citizens from our account there.

"At present we compute, for all your members of American citizenship, the sum total resulting from membership dues from May, 1933 to December 31, 1936. We shall shortly let you know the exact total of this amount for you to compare with your records. The amount itself will be deposited here with the German Labor Bank (Bank der Deutschen Arbeit) in accordance with the foreign exchange laws subject to your order at any time. At the same time, as of today, all citizens of American nationality are excluded from our organization, and are left to you for further care.

"With German greeting

(signature illegible)"

the agency and the foreign principal under the McCormack Act;[4] that the said contract, on advice of counsel, was cancelled on June 24, 1938, prior to the effective date of the McCormack Act with counsel advising that because of the cancellation there was no need for the D.A.B. to register.

We find nothing in the McCormack Act as applicable to the present facts, warranting the contention that it contemplated only agencies created by an express contract. Section (2) (c) does provide that a copy of the contract, if written, or a statement of its terms and conditions, if oral, be attached to the agent's statement, but we fail to see that such language restricted the necessity of filing a statement to propaganda agents who were admittedly such and who had express oral or written agreements containing that fact. The McCormack Act is a national safety measure adopted at the time when the United States was being forced into the then existent war. The authorities wanted to know who were the agents of foreign powers disseminating propaganda in this country. That knowledge was vitally important at the time to assist in preventing receipt by our people of unlabeled special pleading on behalf of alien governments. A fair reading of Section 612 of the Act indicates that the persons who were required to register were any agents of a foreign principal as defined by Section 611(d) of the Act which reads: "(d) The term 'agent of a foreign principal' means any person who acts or engages or agrees to act as a public-relations counsel, publicity agent, or as agent, servant, representative, or attorney for a foreign principal, and shall include any person who receives compensation from or is under the direction of a foreign principal. * * *"

If conceded possession of an express contract with a foreign principal was the all controlling requirement for registering, then the McCormack Act was rendered meaningless. The true test, we think, was whether agency in fact existed, with the term agency defined substantially as in the Restatement of Agency, Section 1, which states it to be: "The relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

The Government's case was not founded on the letter contract. The latter was simply part of the chain of proof which assisted in showing the connection between the German Reich and its subsidiaries with the D.A.B. The Government affirmatively alleged and its evidence tended to show that the written contract which did not allude to propaganda was not the whole agreement between the parties; further that the cancellation of that contract was a subterfuge in line with the protective colorization adopted by the defendants for the D.A.B. in order to fit in with the rapidly developing situation in this country.

On the proposition that the written contract was cancelled on the advice of an attorney so that the D.A.B. would not be forced to register, it is true as asserted by the Government, that it does not appear that the attorney was fully informed of all of the activities of the organization and it is also true that though the attorney was in Court during the trial he was not called as a witness. The appellants urge that the testimony of two Government witnesses, Volbers and Johannsen, former officers and directors of D.H.V. and its successor, D.A.B., was to the effect that the letter contract was the only agreement between their group and the German Labor Front. The Government characterizes their testimony as vague. Volbers did say a written contract had been entered into, signed by himself, Johannsen and Euting, the latter representing the German Labor Front. Johannsen did not recall any written contract being signed or that he signed any such contract. That testimony and the credibility of those two witnesses were for the jury to pass on along with the other evidence in the case. The decision in Viereck v. United States, 318 U.S. 236, 63 S.Ct. 561, 563, 87 L.Ed. 734, turned on a question not involved here and is not applicable. There the Trial Court charged a Government request, " * * * if you find that the defendant engaged in the activities set forth in the indictment, it is not necessary that you find that he engaged in such activities on behalf of his foreign principal or principals. It is sufficient if you find that he engaged in the activities,

---

4 Section 2(c) of the McCormack Act reads:

"A copy of all contracts of employment under which such person acts * * * as such agent, if written, or a full statement of the terms and conditions thereof, if oral."

whether on behalf of his foreign principal or principals or on his own behalf." The Supreme Court held in reversing the District Court that the conviction could be sustained only if failure to disclose activities on the defendant's own behalf is a criminal offense.

The next point involves the denial of the defense motion to strike out the evidence of the Government witness Davidson who testified as to the nature of the publications circulated by the appellants. Propaganda is a subject for expert testimony. United States v. Pelley, 7 Cir., 132 F.2d 170. The question of the expert's competency was for the Trial Court, (2 Jones on Evidence, 4th Ed. 1938, § 389; 3 Wigmore, Evidence, 3d Ed. 1940, § 944) and there is no indication of any abuse of discretion. The District Judge properly left the weight of Davidson's testimony to the jury, saying in his charge: "There was expert testimony given in the course of the trial which the court allowed and it was subject to cross-examination. Simply because that testimony was allowed does not mean that it is binding on you. It is evidence which you may consider and to which you will give that degree of importance and weight which you think it merits."

It is contended by appellants that the limitation imposed by the District Court on the cross examination of the Government witness, Richards, an investigator, was error. Richards, for national security reasons, was permitted to testify under an assumed name. Cross examination as to part of his background which ante-dated by several years the period covered by his testimony, was not permitted. None of the data testified to by him at the trial was obtained by the witness during the period which was barred to cross examination. The witness was on the stand three days, two and a half of which apparently were given over to his cross examination. A study of his testimony shows that the defense very thoroughly developed the various avenues of the cross examination and that anything further would have been cumulative. We agree, of course, that cross examination is a matter of right but its proper bounds are within the sound discretion of the Trial Judge. The defendants were not unduly restricted in that regard. United States v. 3.544 Acres of Land, etc., 3 Cir., 147 F.2d 596. The situation is readily distinguishable from that in Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 where the Trial Court had refused permission to cross examine into the present employment and residence of a Government witness.

The appellants also assert that a certain film shown to the Court and jury at the trial was not the same as the original film which it is claimed had been shown in 1936. They maintain that the first half of the film dealing with the period from 1918 to 1933 was entirely omitted and that an O.W.I. marking of 1942 on the film shows it to be of much later date. There was testimony on behalf of the Government that the film was the same as had been shown at D.A.B. meetings. This too was peculiarly a jury problem and therefore left to that body by the Trial Judge.

The balance of appellants' points not included in the above discussion have been carefully examined and are without merit. No useful purpose would be served by detailing the evidence with respect to each appellant. It is enough to say that it involved all of them as active participants in the conspiracy charged to a greater or lesser degree. No errors appear which substantially prejudiced the appellants. Therefore the judgments appealed from must be affirmed. Section 269 of the Judicial Code as amended, 28 U.S. C. Sec. 391, 28 U.S.C.A. § 391. Berger v. United States, 1 Cir., 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Jarvis v. United States, 1 Cir., 90 F.2d 243, certiorari denied 302 U.S. 705, 58 S.Ct. 25, 82 L.Ed. 544; Stokes v. United States, 5 Cir., 93 F. 2d 744, certiorari denied 304 U.S. 558, 58 S.Ct. 945, 82 L.Ed. 1525.

Affirmed.

BIGGS, Circuit Judge (dissenting).

The appellants contend that prior to the amendments to the Foreign Agents' Registration Act effected by the Act of April 29, 1942, 56 Stat. 248, 22 U.S.C.A. § 611 et seq., registration was required only if there was an "express contract" of employment between the agent and the foreign principal. They assert that the League was not bound by an express contract of employment, i.e. a "written or oral" contract, to serve as a propaganda agent for the German Reich or any of its departments of government; hence the League was not required by law to register with the Secretary of State and

the appellants may not be found guilty of a conspiracy to aid the League to avoid registration.

Was an express contract of employment necessary in order to require registration by the League? In discussing this question a statement of the pertinent statutory provisions is desirable.

The original act by Section 1(d), 52 Stat. 632, defined as "agent of a foreign principal" "any person who acts or engages or agrees to act as a public-relations counsel, publicity agent, or as agent, * * * for a foreign principal." The quoted language of the definition literally embraces as an agent of a foreign principal any person "who acts" as an agent as distinguished from one who "engages" or "agrees" to act as an agent. The use by Congress of the disjunctive "or" seems significant. On the other hand, it will be observed that most of the relations designated in subparagraph (d) are those in which ordinarily there is an express contract of employment. The legislative history of the act as well as its other provisions also tend to support the view that Congress had in mind relations created by contracts of employment.[1] Section 2 of the original act, containing the registration provisions for the failure to observe which the criminal sanctions of Section 5 are to be imposed, provides that "an agent of a foreign principal" shall file with the Secretary of State "a copy of all contracts of employment under which such person acts or agrees to act as such agent, if written, or a full statement of the terms and conditions thereof, if oral * * *." Section 2(d) requires the registration of the date when each "contract" was made. Does not the use of the word "contract" and the phrase "contracts of employment" indicate that Congress intended that agency created by express contract, rather than a status of principal and agent reasonably inferred from the conduct of the parties,[2] to have been the basis for the requirement of registration?

By the Act of August 7, 1939, the Foreign Agents' Registration Act was amended in pertinent part by adding a provision that the term "agent of a foreign principal" "shall include any person who receives compensation from or is under the direction of a foreign principal."[3] This language construed literally would include the League for it must be conceded that the evidence shows that the League was acting under the direction, indeed, under the domination, of the German Labor Front. But the definitions of Section 1 must be read in the light of the registration provisions of Section 2. These remained unchanged by the 1939 Act. Having in mind the consideration that a penal statute must be construed strictly, I conclude that an express contract was necessary in order to require registration by the League.

[1] The McCormack Committee, reporting in 1935 on its "Investigation of Nazi and Other Propaganda" recommended: "That the Congress should enact a statute requiring all publicity, propaganda, or public-relations agents or other agents or agencies, who represent in this country any foreign government or a foreign political party or foreign industrial or commercial organization, to register with the Secretary of State of the United States, and to state name and location of such foreign employer, the character of the service to be rendered, and the amount of compensation paid or to be paid therefor." H.R.Rep. No. 153, 74th Cong., 1st Sess., p. 23. The House and Senate committee reports, urging enactment of the McCormack bill which became the 1938 Act, both declare that its purpose was to carry out these recommendations of the McCormack committee. H.R. Rep. No. 1381, 75th Cong., 1st Sess., p. 1; S.Rep. No. 1783, 75th Cong., 3d Sess., p. 2.

[2] That the status of principal and agent may be imposed by law upon parties from their conduct, reasonably interpreted, is well established. See Williston on Contracts, Revised Edition, Vol. 1, § 274; Restatement, Agency, §§ 1 and 15; 2 C.J.S., Agency, § 1; Agency, American Jurisprudence, § 3.

[3] The Report of the Committee on the Judiciary of the House of Representatives states, "The definition of 'agent of a foreign principal' is * * * broadened by including 'any person who receives compensation from or is under the direction of a foreign principal'." A letter from the Secretary of State to the Chairman of the Judiciary Committee is included in the report and this letter states in pertinent part that the addition of the phrase "serves to give legislative sanction to the Department's interpretation of the term 'agent of a foreign principal' as used in the present law and is for this reason considered desirable." See H.R.Rep. No. 711, 76th Cong., 1st Sess., p. 1, pp. 2, 3. See also S.Rep. No. 902, 76th Cong., 1st Sess., pp. 1, 2.

The views hereinbefore expressed as to the necessity of the existence of an express contract between principal and agent as a requirement of registration find confirmation in the 1942 amendments to the act. See 56 Stat. 248. Section 1 was amended so that paragraph (d), subsection (1) now reads: "The term 'agent of a foreign principal' includes any person who acts or agrees to act, * * * or who is or holds himself out to be, *whether or not pursuant to contractual relationship*,[4] a public-relations counsel, publicity agent * * * servant, agent, representative, or attorney for a foreign principal * * *." Section 2 of the act was amended by striking out paragraph (c) and substituting in lieu thereof a new paragraph which in pertinent part is as follows: "Copies of each written agreement and the terms and conditions of each oral agreement, including all modifications of such agreements, or, *where no contract exists, a full statement of all of the circumstances, by reason of which the registrant is an agent of a foreign principal * * *.*"[5] See 22 U.S.

C.A. §§ 611(c) (1) and 612(a) (9). It will be perceived that the amendments were designed to cover situations in which a person serves as a propaganda agent for a foreign principal and subject to its direction but without an express contract of employment.[6]

It is not alleged in count II of the indictment that there was an express contract between German-American Vocational League, Inc., and the German Labor Front or any other foreign principal which embraced within its terms the multitudinous propaganda activities performed by the League for the Reich. It is alleged that in order to disguise the true scope and nature of its agency for the Reich the League did enter into a contract with the Labor Front which provided for reciprocal rights of membership in the League and in the Front and repayment by the Front to the League of dues collected by the League and sent by it to Germany.[7]

The charging part of count II of the indictment charges "(a)" that knowing that

---

[4] Emphasis supplied.

[5] Emphasis supplied.

[6] Little light is cast upon the 1942 amendment by its legislative history. Attention is directed to H.R.Rep. No. 1547, 77th Cong. 1st Sess. This report indicates that the proponents of the amendment felt that few fundamental changes were to be made in the operation of the Foreign Agents Registration Act by the amending statute. The report states, p. 3: "With respect to the term 'agent of a foreign principal' as defined in section 1(c), it is believed that clause 2 [of the amending act] merely expresses what is already implicit in the statute * * *. Clause 3 [of the amending Act] which holds that for an individual to assume or purport to act as an agent of a foreign principal suffices to constitute him such an agent, is probably implicit in the present act."

[7] See subparagraph (j) of paragraph 45 of count I, incorporated by express reference into count II, viz., "that for the purpose of concealing and hiding its true character as agent * * * [the] League would * * * assume the false front of * * * a social, vocational and fraternal association of innocuous character, concealing its true part in the * * * plan of world dominance of * * * [the] Reich * * * and * * * [the] League * * * *in order to have written evidence for use in its own defense in the event of official investigation of the true scope and nature of its*

*agency, and in order to disguise such true agency did solicit and enter into a formal written contract with * * * [the] German Labor Front, providing, among other things, for reciprocal rights of membership in * * * [the] League, and in * * * [the] Front, [for] the collection by * * * [the] League of dues * * *, said contract being intentionally silent and inexpressive of the whole scope and nature of the true agency of * * * [the] League, containing no reference to and failing to disclose the part being played and to be fulfilled by it in the broad scheme of dissemination of propaganda in behalf of * * * [the] Reich and the other agency services to be performed* [by the League] * * *."

See also subparagraph (c) of paragraph 45 of count II which alleges that the League cancelled the written contract "* * * *to clear the way for a continuance of the substantial and manifold forms of agency which existed outside of and not by virtue of said written contract, or any other formal written contract or undertaking * * * it,* [the written contract] *being and having been the only formal written undertaking touching, even in limited part, upon the agency or agencies which existed in reality on the part of* * * * [the] *League for its foreign principals * * *,* [for] *such* [written] *contract had never been expressive of, nor intended to express or encompass, the*

the League was "agent, public relations counsel, publicity agent and representative of. and for a foreign principal", and, knowing that there existed an obligation on its part to register with the Secretary of State, the defendants would aid the League in refusing and neglecting to file the registration statement, and "(b)" that in addition to the foregoing as set out under "(a)" the appellants would disguise and conceal the true nature of the League's activities as an agent of the foreign principal.

At the trial one Volbers testified that a written contract was entered into in the summer of 1936 between Johansen, the president of the League, Volbers, sometimes its treasurer and secretary, and Euting, a representative of the German Labor Front, whereby it was agreed that the Front should return dues forwarded by the League to Germany and that a certain "amount" of copies of German Labor Front propaganda publications were to be sent to the League by the Front and distributed by the League among its members. Johansen testified that there was no written contract entered into at the time indicated by Volbers. He was then asked by the United States Attorney, "Well, you do recall that in January, 1937, the German Labor Front wrote a letter confirming the agreement made by Euting and you, whether that agreement was verbal or in writing?" Johansen answered, "Yes." The letter [8] referred to was introduced in evidence and it provided in substance that the League would afford adequate "care and guidance" to members of the German Labor Front in the. United States and that the Front would reimburse the League "with 25% of the dues paid by our members", and would pay for "social welfare of our citizens". The United States next demonstrated by an abundance of testimony that this letter was a "cover" for the real and substantial activities of the League though it was shown also that the League received from the Front money totalling between $12,000 and $13,000.

The court charged in the terms of the statute, reading all pertinent parts of the Act to the jury. He stated that the appellants could not be found guilty unless the jury found also that the League "was employed as an agent of the German Reich" and acted at its behest and command. The court, as the appellee candidly points out in its brief [9] then defined the term "agent" "substantially as it is defined in the ordinary common law." [10] No very apt request for a charge respecting the necessity of a finding by the jury that there was an express contract between the League and a foreign principal was made by the defendants, though they shot in the general direction of such a target. The request which most nearly approached this issue was No. 15, viz., "The nature of the task or tasks which * * * [the League] was required to perform under such agency agreement must be proven." This request went too far for the parties were not engaged in trying a suit on a contract. The appellants should have requested a charge that it was necessary that the jury find that there was an express contract or agreement that the League should embark upon the task of being a propaganda agent for the Reich.

At the trial, as is demonstrated by the record, at the argument and upon its brief before this court, the United States took the position that no proof of the existence of an express contract was necessary and that in fact there was no express contract, whether oral or written, which embraced the multitudinous activities performed by the League for the Reich. The appellee took the position at the trial and now takes the position that since it proved that the League performed services for the Reich it was an agency of the Reich as that term is defined at common law. In its brief in this court it makes that precise point, cit-

real substantial and complete agency, and activities pursued and to be pursued in furtherance of such agency, on the part of * * * [the] League for its foreign principals * * *." (Emphasis added to quotations.)

[8] Exhibit No. G-37 NY 621.

[9] See the brief of the United States, pp. 65-66.

[10] The learned trial judge stated, "* * * you must thus be satisfied that the German-American Vocational League was actually an agent of one or more of the foreign principals mentioned in the indictment.

"The evidence you are to consider in determining whether or not the agency existed, like the evidence from which the Government asks you to infer the existence of a conspiracy, is entirely circumstantial."

ing Section 1 of the Restatement, Agency, and paragraph (a) of the Comment to that Section.[11] The appellee also states in its brief "If * * * [the appellants] mean that the agency relationship is consensual and that there must be an understanding between principal and agent as stated in the Restatement of Agency, they are, of course, correct; if they mean that the Act in employing the term 'agent' did not include every person who would be recognized as an agent by the common law but included only such persons as are agents pursuant to a particular form of words, they are reading a limitation into the Act which has no statutory justification."

In this very confused situation certain things stand out. It is apparent (1) that the written contract proved by Volbers' testimony, as well as that contained in the letter of January 12, 1937, proved by Johansen's testimony, if in effect one and the same contract, was abandoned by the appellee as an agreement which represented the undertakings by the League on behalf of the Reich; (2) that the appellee tried the case on the theory that proof of the existence of an express contract, whether written or oral, was not necessary and that agency proved by the acts of the parties within the definition of Section 1 of the Restatement, Agency, and Comment (a) thereof, was sufficient; and (3) that the charge of the court was substantially to that effect.

As has been indicated, if my interpretation of the Act as it existed prior to the 1942 amendments is correct, it follows that the League was not required to register with the Secretary of State and that the defendants could not be found guilty of conspiracy to aid it in avoiding registration. If the 1942 amendments had been in effect I entertain no doubt that the agency relationship shown to have existed between the League and the Reich would have been within the purview of the statute. The appellants have been tried and convicted upon a theory of the statute stated in H.R.No.1547, 77th Cong., 1st

Sess., as being "probably implicit" in the Act prior to the 1942 amendments. See note 6 supra. But a criminal statute must afford an adequate and certain definition of the crime which it purports to create. Otherwise it will not meet the requirements of the Fifth Amendment. See Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; United States v. Brandenburg, 3 Cir., 144 F.2d 656, 861. Judgments of conviction may not be based upon a definition of a crime which is not expressed with full certainty in a penal statute.

For these reasons I conclude that the judgments of conviction should be reversed.

---

[11] Section 1 is as follows: "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

Comment (a) states, "The relationship of agency is created as the result of conduct by the parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control."