[Crim. No. 1357.   Fourth Dist.   Dec. 19, 1958.]

THE PEOPLE, Respondent, v. RONALD JAMES MORAN et al., Defendants; HARRY HUBBARD et al., Appellants.

Minsky & Garber, Minsky, Garber & Rudof and Bernard W. Minsky for Appellants.

Edmund G. Brown, Attorney General, and William E. James, Assistant Attorney General, for Respondent.

SHEPARD, J.—Defendants were charged with others by indictment with the crime of conspiracy "to cheat and defraud by criminal means, and to obtain money and property by false pretenses and by false promises with intent not to perform such promises, in violation of section 182, subdivision 4 of the Penal Code. . . ."

The cause was tried before the court sitting without a jury. Defendants Moran, Berry, Zarcone, Hubbard and Jackson were found guilty as charged. Probation was granted to all

of the convicted defendants for a period of three years on condition that they spend the first eight months in the sheriff's custody, that they pay certain fines, and that they perform certain restitution in amounts fixed by the court in the judgment. An appeal was taken by Zarcone, Hubbard and Jackson from the order denying a new trial, but Zarcone has abandoned his appeal so that the appeal of only Hubbard and Jackson is before the court at this time.

The first specification of error is that there was no sufficient evidence from which the court could lawfully find that the appellants intentionally entered into a conspiracy with any persons to cheat and defraud as indicated by the indictment.

The cause was in trial for approximately one and a half months, 57 witnesses were examined, and the transcript covers nearly 3,500 pages.

A review of the evidence shows that defendants Moran and Zarcone started a used-car business in San Diego in the fall of 1956, which was moved to another location with an additional partner (not here charged) in February, 1957, and that this business continued at least until the month of May thereafter. To outward appearance this was a legitimate business.

However, the evidence shows that by a systematic use of false advertising, with full knowledge of its falsity and intent to use it falsely, they induced customers to come to the used-car lot with the idea that they could purchase a car with a $5.00 down payment. This intent was made clear not only by the pattern of conduct shown through dozens of transactions produced in evidence, but was also directly testified to by a salesman who worked on the lot with these defendants and who heard instructions given at sales meetings. A fair interpretation of the evidence shows that the trial court was fully justified in believing that the advertisement was pure "come-on," with no intent of performance or truth, and that both of these defendants over many weeks of daily work in the business were fully aware of that fact.

The evidence further shows that once in the clutches of the salesman the prospective buyer was systematically and intentionally fed false and misleading information, both of existing facts and of intended future conduct by the firm which the salesman knew was never intended to be performed. This consisted of many different types of representation, including what could or would be done in refinancing, as to what amounts cars would be sold for, and by obtaining customers'

signatures on blank contracts and later filling in amounts far different than those orally discussed. Space does not here permit the recounting in even sketch form all of the many transactions, details of which were received in evidence. However, the recounting of two will give a sufficient indication of the general pattern of conduct which marked them all.

George Vogel, a baker, saw the advertisement, responded, located a car on the lot marked $495, had the price confirmed by a salesman, and was transferred to the tender ministrations of Jackson. Jackson put a price of $785 on the purchase order and when Vogel noticed it and objected, Jackson said the salesman was a new man and just didn't know. He allowed Vogel $300 in trade on Vogel's Studebaker. Vogel told Jackson he could only pay $30 per month, and Jackson said his firm would carry the financing. He persuaded Vogel to borrow $400 from another source, which Vogel paid to Jackson. The same afternoon Jackson again phoned Vogel and demanded $184 more. Finally, Vogel examined his purchase order and discovered that the car he originally thought he was buying for $495 had been sold to him at the price of $1,385, and instead of $30 a month his total payments, including the payments on the $400 he had borrowed, were $53.87.

Manuel Anthony Zaragoza, a Navy truck driver, saw the ''$5 down'' signs, came to the lot, met a salesman, told him he could pay only $70 per month, selected a car at a purchase price of $2,195, and Jackson was introduced as credit manager. Jackson said ''I am a loan Company'' and would loan Zaragoza sufficient for a down payment. Jackson induced Zaragoza to sign a check for $584.80 although Zaragoza stated he had no money in the bank. He was then induced to sign a blank contract. He paid Jackson $100. Later, he borrowed $585 from a loan company and paid it to Jackson but had trouble getting back the $584.80 check. Jackson assured Zaragoza the payments on the balance of $1,600 would be $50 per month but Zaragoza later discovered the payment had been written in at $70.94 per month. He returned the car for repairs. Returning for it, he found it out for sale and an argument ensued. Zaragoza's total monthly payments ended up at $103 per month, counting the payments to the loan company.

It is understandable that occurrences of this kind might happen once in a great while through misunderstanding, but with dozens of this kind of transactions occurring over a

period of a few weeks and with the pattern similar in each of them; with these defendants working together on the same lot with an agreement between them to split their commissions, plus other evidence from within the organization itself in which the whole plan of operation was loosely outlined by glib instructions on how to lie and what steps to take to enmesh a customer; with conferences going on back and forth on purchases of this kind; with this kind of a pattern between these defendants and the owners and other salesmen on the lot, it was not unreasonable for the trier of fact to be convinced beyond a reasonable doubt that those within the organization were conspiring together to cheat and defraud in the manner described in the indictment. Defense counsel say "One cannot condone the acts of Appellants," but primarily contend against the sufficiency of the evidence to show conspiracy.

A criminal conspiracy is an agreement to commit any crime or do any other act denounced by the statute. The gist of the offense is the unlawful agreement between the conspirators to do an act contrary to law, accompanied by an overt act to at least start to carry the conspiracy into effect. (Pen. Code, § 182; *People* v. *Curtis*, 106 Cal.App.2d 321, 325 [235 P.2d 51].)

It comes into existence in the form punishable by law only when some overt act is committed tending to carry the common purpose into effect. It is not necessary to prove that the parties entered into a concrete written agreement or even that all the parties gathered together at one time for a mutual and immediate discussion and agreement. It can happen that the agreement be arrived at in piecemeal fashion.

It is sufficient if by either direct or circumstantial evidence, or both, the trier of fact is convinced beyond a reasonable doubt that the unlawful agreement did, in fact, come into existence and that while it was still in existence an overt act pursuant to the unlawful conspiracy purpose was committed. (*People* v. *Goldberg*, 152 Cal.App.2d 562, 568 [314 P.2d 151]; *People* v. *Curtis, supra*; *People* v. *Jones*, 136 Cal. App. 722, 726 [29 P.2d 902]; *People* v. *Fratianno*, 132 Cal. App.2d 610, 624, 625 [282 P.2d 1002].)

"As a general rule, a conspiracy can only be established by circumstantial evidence 'for, as the courts have said, it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by

the establishment of independent facts, bearing more or less closely or remotely upon the common design (5 Cal.Jur. 521); and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy'.'' (*People* v. *Steccone*, 36 Cal.2d 234, 238 [223 P.2d 17].)

Jackson contends he only came in after the commencement of the conspiracy and that, therefore, he was only guilty of independent unlawful acts. The evidence sufficiently supports the implied finding of the court that Jackson did act with other members of the conspiracy in furtherance of its purposes and with knowledge of the existence of the conspiracy. ▮ Where a conspiracy has already been formed and at a later date a stranger to the original conspiracy associates himself with the conspirators, and with knowledge of the conspiracy joins with the others in committing overt acts in furtherance of the unlawful purpose, he is guilty as a member of the conspiracy.

''It is of course true that mere association with the perpetrator of a crime is not sufficient to prove a criminal conspiracy. (*Dong Haw* v. *Superior Court*, 81 Cal.App.2d 153 [183 P.2d 724].) An entirely different situation may arise, however, when it is shown that a conspiracy is already in existence and that acts are being committed in furtherance thereof.'' (*People* v. *Griffin*, 98 Cal.App.2d 1, 39 [17] [219 P.2d 519].)

Jackson also contends that he withdrew from the conspiracy and therefore should be exculpated from responsibility therefor. The evidence shows that Jackson was actively identified with at least 14 of the transactions detailed in the testimony, and the evidence is also sufficient to support the finding that he was fully aware of the existence of the conspiracy during most of those transactions. There was no conclusive proof that Jackson ever withdrew from the conspiracy at any time but, even if he had withdrawn, he had already committed acts from which the jury were entitled to conclude that he was actively participating in the conspiracy with knowledge of its purposes.

▮ ''. . . [O]ne who has joined a criminal conspiracy can only effectively withdraw therefrom by some affirmative act bringing home the fact of his withdrawal to his confederates. 'Some affirmative act bringing home the withdrawal to the knowledge of his confederates is necessary, otherwise the conspiracy once established will be presumed to continue until the ends are accomplished or its abandonment established.' (Cit-

ing cases.)'' (*Loser* v. *Superior Court*, 78 Cal.App.2d 30, 32 [1] [177 P.2d 320].)

The order denying the motion for new trial is affirmed.

Griffin, P. J., and Mussell, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 11, 1959.