[Crim. Nos. 143-A, 143-B.   Fifth Dist.   Feb. 23, 1965.]

THE PEOPLE, Plaintiff and Appellant, v. ALLAN T. OLSON et al., Defendants and Respondents.

(Consolidated Cases.)

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, John M. Price, District Attorney, and Clyde H. Small, Deputy District Attorney, for Plaintiff and Appellant.

Bradford, Cross, Dahl & Hefner, Archie Hefner and Ted W. Isles for Defendants and Respondents.

CONLEY, P. J.—Invoking the provisions of the statutes of limitation, the trial judge sustained the motion of defendants, Allan T. Olson and Ben G. Petrucci, to set aside the indictments in 5 Criminal 143-A (Sacramento No. 27045), charging them in Count I with conspiracy to offer for filing a false instrument, to wit: a bid for a garbage franchise, and in Count II the violation of section 115 of the Penal Code by procuring and offering the same bid for filing, and in 5 Criminal 143-B (Sacramento No. 27046), charging conspiracy to pervert or obstruct the due administration of the laws (Pen. Code, § 182, subd. 5). Originally, the indictments also named Ralph Scovel as a defendant, but upon his death the charges were dismissed as to him upon motion of the district attorney. The sole ground of the ruling in each case was that all offenses charged were barred by the three-year statute of limitations (Pen. Code, § 800). There were separate appeals, which were consolidated for hearing by order of this court.

The defendants have filed a voluminous brief consisting of some 257 printed pages, interlarded with a whole library-load of authorities on numerous points, including constitutional arguments; however, if the simple reason for the rulings advanced by the trial judge is justified, all of the other points urged by defendants would be rendered irrelevant to a decision.

Although the appeal in 5 Criminal 143-A covers both counts in the indictment, the Attorney General's office conceded in its brief and on the oral argument that the trial judge was correct in his ruling on the first count because nothing is legitimately alleged in it which did not occur more than three years prior to the offense alleged in the indictment. We need not, therefore, consider the first count; but there is left Count II in which the People claim the statute of limitations does not bar the charge. It alleges: ". . . .That on the 13th day of November, A.D. 1957, at the County of Sacramento, in the State of California, the said BEN G. PETRUCCI did then and there wilfully and unlawfully and feloniously and knowingly procure or offer a false instrument, to wit, a bid for a garbage franchise, to be filed or registered or recorded in a public office, to wit, the office of the Board of Supervisors of Sacramento County, which instrument if genuine could have been filed or registered or recorded under the law of this state; that the ALLAN T. OLSON and RALPH SCOVEL then and there willfully,

unlawfully and feloniously aided and abetted in the commission of said offense; . . .''

The instrument itself shows that more than three years have elapsed, the indictment having been presented on the 10th day of June, 1963, unless the provisions of section 799 of the Penal Code preserve the right to prosecute the criminal charge. That section reads as follows: ''There is no limitation of time within which a prosecution for murder, the embezzlement of public moneys, and the *falsification of public records* must be commenced. Prosecution for murder may be commenced at any time after the death of the person killed, and for the embezzlement of public money or the *falsification of public records,* at any time after the discovery of the crime.'' (Italics added.)

The Attorney General claims that the defendants are accused of ''the falsification of public records,'' and that there is, consequently, no limitation of time to bar that particular charge. If, on the contrary, the defendants are not thereby accused of the ''falsification of public records,'' as that term is used in section 799 of the Penal Code, it would be conceded that the statute of limitations bars the prosecution.

In the year 1956, M. D. Tarshes, the County Executive of Sacramento County, and members of his staff discussed the possibility of changing from a system of permits for the collection of garbage in the area outside the City of Sacramento to the establishment of an exclusive franchise system pursuant to the provisions of section 4201 of the Health and Safety Code. A favorable recommendation was made to the board of supervisors by Tarshes and A. L. Kiefer, County Director of Public Works; the area involved was divided into two parts, one, north of the American River and the other south of that river. Several companies had been operating in the areas involved under permits. North Area Garbage and Rubbish Service (hereafter, for convenience, called North Area) was the largest north of the river; it had ten partners and the organization had been charging $1.25 a month for standard residential garbage pickups. On August 21, 1951, the supervisors decided to invite separate bids for the two proposed franchise areas and, accordingly, a notice to bidders was issued. Kiefer prepared the bid forms; all persons intended to use them were required to sign for them.

Defendants, Olson and Petrucci, had become interested in a Danish garbage composting process and had formed Dano of Sacramento in April of 1956. Petrucci had headed a bone meal company known as By-Dry Feed Products; Olson was a gen-

eral contractor, who operated Brighton Sand & Gravel Company. About October 1, 1956, Dr. Ralph Scovel became interested in the venture; he had been a physician in San Francisco, but later moved to Sacramento, saying that his interest was ''an emotional one on the basis of this Dano process of composting garbage''; Dr. Scovel had received a bacteriological and scientific education and had been a chemist at one time; in his testimony before the grand jury, he stated that he felt that through returning the Dano compost to the soil, farm lands could be improved. In order to make the Dano system work successfully, it was necessary to have a constant supply of garbage. In 1957, Dano of Sacramento merged with Dano of America; Scovel became president, Petrucci, vice-president and general manager, and Olson, secretary. Neither Scovel, nor Petrucci, nor Olson had had any experience in collecting garbage.

The next scene in the drama occurred when NAWDSCO (North American Waste Disposal Service Company) was formed. This partnership was composed of Olson, Petrucci, and Scovel, and, although it was probably not known outside of the partnership, Joseph Arbini was also a partner. In the words of Dr. Scovel as a witness at the grand jury inquiry, Arbini ''wore two hats'' as he was then, also, the managing partner of North Area. NAWDSCO persuaded North Area to haul and collect the garbage if NAWDSCO should be successful in its bid for a county franchise; North Area was to get $1.10 per month for weekly 30-gallon residential pick-ups of garbage; this amount was cut by a later agreement to $ 1.00, and raised afterwards to $1.05. North Area did not bid for the franchise itself, being resigned to function as subcontractor. Three companies did in fact put in bids for one or the other of the franchises on November 13, 1957. As to the franchise in the northern part of the county, there was a bid by NAWDSCO of $1.60 and a putative bid of $1.75 by Estes Service Company of Colorado.

The record shows that Mr. Estes was from Texas and that he had come to Sacramento at the request of Loren Monroe, whose wife was a partner in North Area. Estes was undoubtedly a big garbage man. The Monroes had hoped that he would file an honest competitive bid and that they could form an operating company with him. It did not work out that way, however; Estes testified that he decided not to bid after he met Petrucci, Olson, Scovel, and Arbini and that, while he left Sacramento before the actual opening of the bids, he had,

at the suggestion of Petrucci, signed two bids in blank leaving them with Petrucci to fill out as he pleased.

NAWDSCO prepared for itself forms of two bids for each area, one for $1.60 and one for $1.40; these were all signed by Olson. On November 13, Petrucci took the bids with him to the board of supervisors' quarters and, seeing that no previously unknown bidder intended to compete, he filed the two for $1.60. NAWDSCO was awarded the franchise for the northern area on January 6, 1958; its competitor in the southern area was awarded a franchise at the lower figure of $1.25 per standard can.

Each of the partners in NAWDSCO invested only $1,000 to provide capital for its operations; they used land owned by Olson as a dump site; they effectuated the agreement with North Area to use their equipment and staff to collect and dispose of the garbage at $1.05 per can; and they used the Dano plant to take care of a relatively small part of the garbage collected by North Area. The franchise was to run for fifteen years with the right of review as to rates reserved to the supervisors after three years. The evidence shows that NAWDSCO made tremendous profits and that no rate review was instituted immediately after the expiration of the three-year period.

The evidence shows that when Estes, as he testified, had made up his mind that the NAWDSCO people were sure to be awarded their bid, he acceded to the request of Petrucci to sign two bids in blank and to let the NAWDSCO people fill the blanks in these putative bids in any way they pleased. These bids were actually filled out by one or more of the alleged conspirators, and their filing created good "window-dressing" for the award of the franchise to Olson, Petrucci and their associates. With only these two bids for the northern area franchise, it appeared that NAWDSCO was clearly the better bidder as it was 15 cents under the so-called Estes bid. Although the North Area garbage people, by private agreement, would effectuate the actual collection and disposal of the garbage for $1.05 per can, and Petrucci had secretly carried a lower unfiled bid of $1.40 to the board of supervisors' room, intending to use it if there appeared to be competition, the objective results of the bidding seemed to indicate to the public that NAWDSCO'S offer was the best possible.

It is not incumbent upon us at this stage of the case to endorse the tricky actions of the entrepreneurs or to speculate on whether the "rigging" of the bids gave the county grounds to secure some civil remedy, or even to decide whether the acts

of the indicted persons constituted a crime at the time of their commission. At this point of the case, it is sufficient to decide whether what was done was a "falsification of public records" within the meaning of section 799 of the Penal Code; if it was not, the criminal action is barred by the three-year limitation contained in section 800 of the Penal Code.

█ The mere fact that a writing is in the possession of a public officer or a public agency does not make it a public record. (*Miller* v. *Murphy,* 78 Cal.App. 751, 755 [248 P. 934]; *Coldwell* v. *Board of Public Works,* 187 Cal. 510, 518-520 [202 P. 879]; *Whelan* v. *Superior Court,* 114 Cal. 548, 550 [46 P. 468]; *City Council* v. *Superior Court,* 204 Cal.App.2d 68, 73 [21 Cal.Rptr. 896].)

█ " 'A public record, strictly speaking, is one made by a public officer in pursuance of a duty, the immediate purpose of which is to disseminate information to the public, or to serve as a memorial of official transactions for public reference.' " (*State* ex rel. *Romsa* v. *Grace,* 43 Wyo. 454 [5 P.2d 301, 303].) (See also: *People* v. *Purcell,* 22 Cal.App.2d 126 [70 P.2d 706]; *State* v. *Brantley,* 201 Ore. 637 [271 P.2d 668, 672]; *Robison* v. *Fishback,* 175 Ind. 132 [93 N.E. 666, Ann. Cas. 1913B 1271].)

Section 1887 of the Code of Civil Procedure states that there are two kinds of writings:

"1. Public; and,

"2. Private."

Section 1888 of the same code defines public writings as:

"1. The written acts or records of the acts of the sovereign authority, of official bodies and tribunals, and of public officers, legislative, judicial, and executive, whether of this State, of the United States, of a sister State, or of a foreign country;

"2. Public records, kept in this State, of private writings."

Section 1894 of the Code of Civil Procedure states that there are four kinds of public writings: 1) laws, 2) judicial records, 3) other official documents, and 4) public records, kept in this state, of private writings. (See also: *Smith* v. *Paul,* 174 Cal. App.2d 744, 751-756 [345 P.2d 546, 77 A.L.R.2d 1036].)

Writings that happen to be in public offices are not necessarily public records. The case of *Coldwell* v. *Board of Public Works, supra,* 187 Cal. 510, holds that preliminary estimates in the office of a city engineer are not public records. On pages 519-520 of the opinion, it is said: "We are of the opinion that the preliminary estimates and details which form these incompleted data are not of such a character as would constitute them public records. Until they receive some official approval

the documents cannot be considered the act or the record of an act of the city engineer or of the board of public works. They cannot be considered the official acts of the city engineer because they are compiled in his office, for he testified that 'I don't allow anything to go out of my office except it has my final, definite approval.' They have not attained the character and dignity of completed acts or documents of any kind until approved. Until a satisfactory plan or estimate is achieved, the documents are but preliminaries to what will ultimately be an act of the city engineer. When a satisfactory plan is adopted, the tentative ones are discarded unless, as testified by the city engineer, they relate to the plan which is finally adopted, in which case they are included in the files with the accepted plan. Therefore, these preliminary matters are not 'public records in the office of an officer,' within the meaning of the sections of the codes and the charter.''

The document that was involved here was merely a bid. It is quite possible that, under the general principles of agency and contract, the Estes Service Company would have been responsible for what appeared over its signature if by some strange chance the ''rigged'' bid had been accepted by the county. It seems, therefore, that while the use of the bid may well have been fraudulent, the document itself was not falsified; it was neither forged nor changed after its original complete preparation. ■ Furthermore, a bid is not in any sense a complete or binding contract when it is filed or even when it is opened for; for, generally speaking, a bid is not effectuated until it is accepted and merged in a formal contractual obligation. A bid may be withdrawn at any time before acceptance (17 C.J.S., Contracts, § 50, p. 707). (See also: *Grieve* v. *Mullaly,* 211 Cal. 77 [293 P. 619]; *Podlasky* v. *Price,* 87 Cal.App.2d 151-157 [196 P.2d 608]; *Minner* v. *Sadler,* 59 Cal.App.2d 590, 596 [139 P.2d 356]; *Bullock* v. *McKeon,* 104 Cal.App. 72, 78 [285 P. 392].) That it may have been used for a fraudulent purpose cannot be gainsaid, but that it was a falsified public record within the meaning of section 799 of the Penal Code cannot be claimed.

■ Falsification of public records refers to those writings which evidence the completed acts of public servants, such as the minutes of courts, public boards and committees, or those documents which under the law must be recorded by a public officer, or legal instruments, such as the wills of decedents. ■ There is no public record involved here which was falsified, and, therefore, the trial judge was correct in

ruling that the three-year statute of limitations barred the prosecution and that the indictment should be dismissed.

The statute of limitations is said to bar the other indictment 5 Criminal 143-B (Sacramento No. 27046) because the last three specified overt acts which alone occurred within the three-year-period of limitation actually have nothing to do with the charge of conspiracy to pervert or obstruct the due administration of the laws. The basic allegation of the indictment is that the defendants ''. . . did then and there wilfully, unlawfully and feloniously conspire, combine and agree together to commit a felony, to wit, pervert or obstruct the due administration of the laws, namely, § 4200 et seq., Health and Safety Code, State of California.''

The first claimed overt act is: ''That on or about November 12, 1957 . . . [defendant Petrucci] did then and there obtain the signature of Estes Service Company of . . . Colorado, by J. W. ESTES on a blank bid form provided by the County of Sacramento, said bid form titled ''Franchise Area No. 1 . . .''

Overt Act No. 2 was: ''That on or about November 12, 1957, . . . and in furtherance of . . . said conspiracy, the said BEN G. PETRUCCI did then and there cause said signed bid as alleged in Overt Act No. 1 to be filled in and completed with words and figures.''

Then, it is said in the allegation of Overt Act. No. 3: ''That . . . said BEN G. PETRUCCI did cause said signed and completed bid as aforesaid to be sealed and submitted to the Board of Supervisors of Sacramento County.''

Overt Act No. 4 alleges that ''. . . on or about November 13, . . . BEN G. PETRUCCI, ALLAN T. OLSON and RALPH SCOVEL did cause a like bid . . . but in different words and figures to be submitted to the Board of Supervisors of Sacramento County . . .'' on behalf of North American Waste Disposal Service Company, a copartnership, consisting of said BEN G. PETRUCCI, ALLAN T. OLSON, RALPH SCOVEL and one JOSEPH ARBINI.

Overt Act No. 5 is to the effect that the defendants ''. . . having been awarded said franchise did sign a franchise agreement with the said County of Sacramento on behalf of said co-partnership, North American Waste Disposal Service Company.''

Overt Act No. 6 refers to the payment on or about January 6, 1961, to the County of Sacramento ''. . . and in furtherance of the object of said conspiracy . . . .'' of the sum of $100, that being the amount that the partnership, NAWDSCO, or North American Waste Disposal Service Company was obligated to pay for the year 1961 under the franchise.

Overt Acts Nos. 7 and 8 as alleged in the indictment, refer to the similar payment of $100 in each of the years 1962 and 1963.

The Attorney General claims that the specification of Overt Acts Nos. 6, 7 and 8 removes the tolling effect of the statute of limitations, because such acts all occurred within three years before the presentment of the indictment. If any of these last three acts was a necessary part of the alleged crime which was the subject of the conspiracy, then clearly the statute of limitations (Pen. Code, § 800) does not apply. If, on the other hand, Overt Acts Nos. 6, 7 and 8 were not an essential part of the offense charged, but, simply followed the completion of the alleged conspiracy, then, the statute of limitations does come into play and bars prosecution under the indictment.

■ The opinion in the case of *People* v. *Crosby,* 58 Cal.2d 713, 728 [25 Cal.Rptr. 847, 375 P.2d 838], points out that an overt act, properly alleged, "marks the commission of the crime and fastens criminal liability upon the conspirators"; and that the running of the period of limitations begins at that time. (See also: *People* v. *Van Eyk,* 56 Cal.2d 471, 478 [15 Cal.Rptr. 150, 364 P.2d 326]; *Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 184-185 [281 P.2d 250]; *People* v. *Robinson,* 43 Cal.2d 132, 138 [271 P.2d 865]; *People* v. *Buffum,* 40 Cal.2d 709, 715 [256 P.2d 317]; *People* v. *Buono,* 191 Cal.App.2d 203 [12 Cal.Rptr. 604]; *People* v. *Wells,* 187 Cal.App.2d 324, 329-331 [9 Cal.Rptr. 384]; *People* v. *Mason,* 184 Cal.App.2d 317, 368-369 [7 Cal.Rptr. 627]; *People* v. *Brown,* 131 Cal.App.2d 643, 656-657 [281 P.2d 319]; *People* v. *Hess,* 104 Cal.App.2d 642, 678 [234 P.2d 65]; *People* v. *Gordon,* 71 Cal.App.2d 606, 628-629 [163 P.2d 110].)

■ In California, it is necessary to prove an overt act in order to show that an indictable conspiracy exists (Pen. Code, § 184). The section just cited requires that the overt act ". . . be done within this state to effect the object thereof, by one or more of the parties to such agreement. . . ." It is only necessary to prove one overt act (*People* v. *Shurtleff,* 113 Cal.App. 739 [299 P. 92]). ■ But, by definition, the overt act must be one to effect the object of the conspiracy (*People* v. *Gordon, supra,* 71 Cal.App.2d 606), or which, at least, has a tendency to forward the purpose of the conspiracy (*United States* v. *Anderson,* 45 F. Supp. 943; *People* v. *Pierce,* 110 Cal.App.2d 598 [243 P.2d 585]). In this country, evil thoughts alone cannot constitute a criminal offense; unless and until something objective is done toward the effectuation of the

illegal plan, no prosecution is justified; if there is no overt or open act there can be no conviction, and the overt act must be such as furthers the object of the conspiracy (*People* v. *Mintz,* 106 Cal.App. 725 [290 P. 93], reversed on other grounds, 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484]; *People* v. *Nasworthy,* 94 Cal.App.2d 85 [210 P.2d 83]; *People* v. *Corica,* 55 Cal.App.2d 130 [130 P.2d 164]).

In *United States* v. *German-American Vocational League,* 153 F.2d 860, 863, it is said: " 'An overt act is one which manifests the intention of the doer to commit the offense.' "

It has been reiterated more than once in apposite legal opinions that an overt act must ". . . at least start to carry the conspiracy into effect" (*People* v. *Moran,* 166 Cal.App.2d 410, 414 [333 P.2d 243]; *People* v. *George,* 74 Cal.App. 440 [241 P. 97]). *Chavez* v. *United States,* 275 F.2d 813, 817, says: "In criminal law an overt act is an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime."

One reason for requiring the allegation and proof of an overt act in connection with a conspiracy is to allow an opportunity to the conspirators to repent and to terminate the unlawful agreement before any decisive act is done in furtherance of it (1 Witkin, Cal. Crimes, § 118, p. 111). The requirement of the allegation and proof of such an overt act ". . . affords a *locus poenitentiae,* so that before the act done either one or all of the parties may abandon their design, and thus avoid the penalty prescribed by the statute." (*United States* v. *Britton,* 108 U.S. 199 [2 S.Ct. 531-534, 27 L.Ed. 698].)

An analysis of the charge made in this indictment shows that the alleged illegal act was the original procurement of the franchise through "rigging" of the bids for the collection of garbage in northern Sacramento County, and that the conspiracy was not a continuing one, but that it terminated when the object of securing this franchise through alleged fraudulent means was attained in 1958. The earning of profits was not a part of the crime charged. The accusation was that the defendants did "pervert or obstruct the due administration of the laws," and this clearly referred to securing the franchise by fraudulent bidding. Overt Acts Nos. 6, 7 and 8 merely followed the accomplishment of the object of the alleged conspiracy and they were in no sense a part of the crime or, properly speaking, the overt or objective acts which furthered the crime.

As an evidentiary incident of a conspiracy, a statement of one of the conspirators, during the existence and in

furtherance of the conspiracy, may be admitted against all of the conspirators. ■ However, ''. . . if made after the act designed is fully accomplished and after the object of the conspiracy has been either attained or finally defeated, the declaration will be admissible only against the person who made it.'' (*Del Campo* v. *Camarillo,* 154 Cal. 647, 653 [98 P. 1049].)

■ As is said in 15 Corpus Juris Secundum, Conspiracy, section 43, page 1068: ''The overt act . . . cannot succeed the completion of the contemplated crime.''

There is a wealth of authority so holding. Among the cases to this effect are the following: *Yates* v. *United States,* 354 U.S. 298 [77 S.Ct. 1064, 1 L.Ed.2d 1356] ; *Grunewald* v. *United States,* 353 U.S. 391, 401 [77 S.Ct. 963, 972, 1 L.Ed.2d 931, 62 A.L.R.2d 1344] ; *Lutwak* v. *United States,* 344 U.S. 604 [73 S.Ct. 481, 97 L.Ed. 593] ; *Krulewitch* v. *United States,* 336 U.S. 440 [69 S.Ct. 716, 93 L.Ed. 790] ; *Wilson* v. *United States,* 275 F. 307, 314; *United States* v. *Ehrgott,* 182 F. 267, 273; *Lonabaugh* v. *United States,* 179 F. 476, 481 [103 C.C.A. 56] ; *In re Black,* 147 F. 832, 840; *Hall* v. *United States,* 109 F.2d 976, 984; *United States* v. *Great Western Sugar Co.,* 39 F.2d 152, 154; *Rose* v. *St. Clair,* 28 F.2d 189, 191; *United States* v. *McGee,* 108 F. Supp. 909, 912-913; *State* v. *Bennett,* 81 Okla. Crim. 206 [162 P.2d 581].

It is our conclusion that the trial court was correct in its holdings, and that the judgments of the court below must be affirmed. In view of this decision, it will be unnecessary to consider any of the other points urged by the defendants. If the subject matter of the indictments was in fact criminal, as believed by the grand jury, it is obvious that the prosecution began too late. Thus, we have another concrete example of the truism that civic virtue demands timely action. Eternal vigilance is the price of good government.

The judgments are affirmed.

Brown (R. M.), J., concurred.

STONE, J.—Concurring and dissenting. I concur in the affirmance as to the charge of falsifying public records, but I dissent from the affirmance as to the conspiracy charge.

As I view the case, the ''rigged bid'' was not the primary object of the conspiracy. This was a business conspiracy and, like most businesses, the objective was to make money. True, defendants conspired by means of collusive and fraudulent bidding to extract more money from the citizens of Sacramento

than they could have collected by honest, competitive bidding. However, the bidding was merely a means to an end, that is, it implemented the conspiracy. The collusive bidding planted the tree from which defendants hoped to pluck the fruit, but the tree had to be nurtured to continue producing. The $100 annual payment and the yearly renewal of the franchise kept the tree alive, thus enabling defendants to reap the harvest.

We learn from Fricke on California Criminal Law (8th ed.) page 124, under the title "Scope of the Conspiracy" that: "In a conspiracy to commit a crime the conspiracy continues not only until that crime has been committed but until the ultimate object of the crime has been accomplished and the liability of the conspirators, as such, extends beyond the mere consummation of the crime. (*People* v. *Tinnin,* 136 Cal.App. 301 [28 P.2d 951] ; *People* v. *Kavanaugh,* 107 Cal.App. 571 [290 P. 594] ; *People* v. *Wagner,* 133 Cal.App. 775 [24 P.2d 927] ; *People* v. *Lorraine,* 90 Cal.App. 317 [265 P. 893].) Thus a conspiracy to commit the crime of robbery is not ended until the spoils of the robbery have been divided (*People* v. *Dean,* 66 Cal.App. 602 [226 P. 943]) or, if the crime be kidnapping for ransom, until the ransom has been paid. (*People* v. *Wagner,* 133 Cal.App. 775 [24 P.2d 927].) "

If each annual payment and renewal of the franchise was an overt act carrying out the objects of the conspiracy, as I have concluded, then the statute of limitations had not run prior to the return of the indictment. Volume 1 Witkin, California Crimes, section 237, pages 226-227, states the rule thus: ". . . although 3 years may have passed from the time of the first overt act, any subsequent overt act starts a new period running; i.e., a prosecution is not barred if any overt act was committed within the period. (See *People* v. *Hess* (1951) 104 Cal.App.2d 642, 678 [234 P.2d 65] ; *Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 184 [281 P.2d 250] ; *People* v. *Crosby* (1962) 58 Cal.2d 713, 728 [25 Cal.Rptr. 847, 375 P.2d 839] ; 1 Wharton 420; 62 A.L.R.2d 1369.) "

The original bid gave defendants the right to an exclusive franchise, but they had to pay $100 in the exercise of that right each year and secure a franchise renewal. Therefore, each payment for each renewal was an overt act in furthering the conspiracy to "fleece" the householders.

I would affirm the judgment as to count I, and reverse the judgment as to count II.

Appellant's petition for a hearing by the Supreme Court was denied April 21, 1965.